Jeffery Lee WOOD, TDCJ No. 999256, Petitioner,

v.

Douglas DRETKE, Director, Texas Department of Criminal Justice, Criminal Institutions Division, Respondent.

No. SA–01–CA–423–OG.

United States District Court, W.D. Texas, San Antonio Division.

Aug. 24, 2005.

J. Scott Sullivan, San Antonio, TX, for Petitioner.

Tomee M. Crocker, Office of the Attorney General, Capital Litigation Division, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

ORLANDO L. GARCIA, District Judge.

Petitioner Jeffery Lee Wood filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his March, 1998, Bandera County convic-

tion for capital murder and sentence of death.[1] For the reasons set forth at length hereinafter, petitioner is not entitled to federal habeas corpus relief from this Court but is entitled to a Certificate of Appealability on some of his claims herein.

### I. Statement of the Case

#### A. Factual Background

There is no genuine dispute as to the operative facts regarding petitioner's offense. Shortly after 6:00 a.m. on January 2, 1996, while petitioner remained outside in a vehicle that petitioner had borrowed from his brother, Danny Reneau entered a Texaco station located near IH–10 in Kerrvile, Texas and fatally shot store clerk Kriss Keeran with a .22 caliber pistol.[2] Reneau and petitioner then removed the

1. On his pleadings filed in this Court, petitioner spelled his first name as "Jeffery," the same spelling of petitioner's first name given by the State of Texas' Department of Criminal Justice on its official website, www.tdcj.state.tx.us/stat/woodjeffery.htm. The original indictment under which petitioner was tried spelled petitioner's first name as "Jeffery." Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), volume 1 of 2, at p. 2.

The respondent has consistently spelled petitioner's first name as "Jeffrey" on all pleadings filed in this cause. This may be due to the fact the Texas Court of Criminal Appeals' published opinion affirming petitioner's conviction and sentence spelled petitioner's first name as "Jeffrey." Wood v. State, 18 S.W.3d 642 (Tex.Crim.App.2000). The Texas Fourth Court of Appeals also has used the name "Jeffrey" when identifying petitioner. Ex parte Wood, 952 S.W.2d 41 (Tex.App.—San Antonio 1997).

Because petitioner was indicted and tried under the name "Jeffery" and has consistently used that spelling on his pleadings filed in this cause, this Court will employ that spelling as well.

2. Petitioner gave law enforcement agents two formal statements detailing his involvement in Keeran's murder and the robbery of the gas station.

The tape recording of petitioner's first statement was admitted into evidence during the guilt-innocence phase of petitioner's capital murder trial as State's Exhibit no. 12. That recording was played in its entirety and appears at S.F. Trial, Volume 24, testimony of Harry L. Fleming, at pp. 270–310. A 24–page transcription of that same interview was also admitted into evidence as State's Exhibit no. 12–A and appears at S.F. Trial, Volume 33.

The tape recording of petitioner's second statement was admitted into evidence at trial as State's Exhibit no. 13 and was played in its entirety during the guilt-innocence phase of petitioner's capital murder trial. S.F. Trial, Volume 25, testimony of Harry L. Fleming, at pp. 12–39. A 17–page transcription of petitioner's second statement was also admitted into evidence as State Exhibit no. 13–A and appears in S.F. Trial, Volume 33.

In both statements, petitioner acknowledged that (1) he entered the store after Reneau had shot Keeran, (2) Reneau removed the store's safe and cash box, and (3) he and Reneau also removed the store's VCR before they fled the scene. Statement of Facts from Trial (henceforth "S.F. Trial"), Volume 24, testimony of Harry L. Fleming, at pp. 274–75; S.F. Trial, Volume 25, Testimony of Harry L. Fleming, at pp. 16–17.

However, there were discrepancies between petitioner's two statements. In his first statement, petitioner claimed that he did not hear

store's safe, cash box, and the videotape recorder connected to the store's security camera.[3] They proceeded directly to the home of petitioner's parents in Devine, Texas, disposing of the murder weapon along the way.[4] Upon their arrival at the Wood residence, Reneau and petitioner unsuccessfully attempted to open the safe before they settled for withdrawing a portion of the money inside the safe through a slot in the bottom.[5] When their efforts to sledge-hammer open the safe woke petitioner's younger brother, Jonathan, they played the videotape showing Reneau's fatal shooting of Keeran for Jonathan before directing him to destroy the tape with a blow torch.[6]

Petitioner and Reneau were both arrested late on the evening of January 2, 1996. Petitioner gave police two statements concerning his involvement in Keeran's murder. In his first statement, which petitioner gave during the early morning hours of January 3, 1996, petitioner attempted to downplay his advance knowledge of Reneau's plan to rob the store and insisted that Keeran was his good friend.[7] Ap-

---

the fatal shot, he never entered the store after Reneau shot Keeran and that Reneau carried the store's safe, cash box, and VCR out to their vehicle by himself. S.F. Trial, Volume 24, at pp. 274–75. In his second statement, petitioner admitted that (1) he heard the fatal shot and entered the store, (2) he observed Keeran bleeding behind the counter, and (3) at Reneau's direction, he removed the store's VCR and carried it, along with the murder weapon, out to their vehicle while Reneau carried the store's safe and cash box. S.F. Trial, Volume 25, at pp. 16–17.

3. *Id.*

4. S.F. Trial, Volume 24, at pp. 276–77 & 288–89. Petitioner indicated in his first statement that Reneau threw the murder weapon out of their moving vehicle off the Val Verde bridge but the hand gun did not fall into the water. *Id.* Petitioner indicated in his second statement, given twelve hours later, that he had led law enforcement officers to the murder weapon in Val Verde. S.F. Trial, Volume 25, at pp. 17–18.

Law enforcement officers testified that they recovered "the murder weapon, identified and admitted into evidence at petitioner's trial as State Exhibit no. 1., a .22 caliber handgun, from the Val Verde Creek bridge on Highway 173 South of Kerrville on January 3, 1996". S.F. Trial, Volume 24, testimony of Lonnie Agold, at pp. 190 & 207; Volume 24, testimony of Harry L. Fleming, at pp. 264–65. A law enforcement officer also testified that (1) State Exhibit no. 14, identified as a .22 caliber bullet, was retrieved by the medical examiner during Keeran's autopsy and (2) State Exhibit no. 18, a photograph from Keeran's autopsy, showed the entry wound of the fatal shot into Keeran's head. S.F. Trial, Volume 24, testimony of Lonnie Agold, at pp. 204–06.

For unknown reasons, no expert testimony or other evidence was offered during petitioner's trial establishing the precise cause of Keeran's death or matching the bullet removed from Keeran's head during his autopsy with the handgun recovered from the Val Verde Creek bridge.

5. S.F. Trial, Volume 24, at pp. 289–90; S.F. Trial, Volume 25, at pp. 36–37. Petitioner's younger brother Jonathan testified that (1) he was awakened by a loud banging on the morning of January 2, 1996, (2) when he went outside, he observed Reneau and the petitioner hitting a safe with a sledgehammer, (3) petitioner informed him that Reneau had shot someone to get the safe, (4) when he expressed skepticism, petitioner told him they had a videotape of what happened, (5) they went inside and watched the videotape of the fatal shooting of Keeran and the robbery of the store in his brother Jeremy's room, (6) thereafter, at petitioner's direction, he destroyed the videotape in question with a blow torch. S.F. trial, Volume 24, testimony of Jonathan Ray Wood, at pp. 214–18.

Jonathan Wood also testified that the tape recording showed (1) Reneau walk into the store, point his pistol, and say something, (2) there was a shot, (3) "the dude" fell out of sight, (4) Reneau then went to the back of the store, and (5) the tape then cut off. *Id.*, at pp. 219–20.

6. *Id.*

7. S.F. Trial, Volume 24, at pp. 274–75, 279–87, 290–92, & 295–96.

proximately twelve hours later, however, petitioner gave a second statement to law enforcement officers, in which he admitted that (1) he knew Reneau was going to rob the store, (2) he and Reneau returned to their residence at one point in the hours before the robbery to trade one gun for another that Reneau felt would not be as loud when it fired, and (3) he anticipated that Reneau would shoot Keeran if Keeran refused to cooperate with the robbery.[8]

### B. *The Indictment*

On January 22, 1996, petitioner was indicted on a charge of capital murder, to wit, intentionally causing the death of Keeran by shooting Keeran with a firearm in the course of committing and attempting to commit robbery.[9]

### C. *Petitioner's Competency Hearings*

Petitioner's competence to stand trial was fully litigated prior to the start of his capital trial. At the conclusion of petitioner's first competency hearing, held May 6–7, 1997, the jury (1) found by a preponderance of the evidence that petitioner was not then competent to stand trial but (2) also found there was a substantial probability petitioner would attain competency in the foreseeable future.[10] Thereafter, petitioner was committed to a state psychi-

atric facility.[11] On July 3, 1997, the state trial court received a formal report stating that petitioner was deemed competent to stand trial by the staff at the state psychiatric facility.[12]

A second competency hearing was held on October 8–9, 1997, at the conclusion of which a different jury found beyond a reasonable doubt that petitioner was competent to stand trial.[13]

### D. *Guilt–Innocence Phase of Trial*

The guilt-innocence phase of petitioner's capital murder trial began on February 23, 1998. In addition to the evidence and testimony outlined above, the jury watched a videotape of the crime scene taken minutes after the discovery of Keeran's body.[14] The jury also heard testimony from another employee of the gas station that, in the weeks prior to Keeran's fatal shooting, the petitioner and Reneau had often discussed with him the possibility of robbing the store with his cooperation but that he had always considered such discussions to be a joke.[15]

After the State rested, petitioner's trial counsel called petitioner's girlfriend, who testified that (1) Reneau and her sister were living with her and petitioner at the time of the murder, (2) she was aware that

---

**8.** S.F. Trial, Volume 25, at pp. 14–37.

**9.** Trial Transcript, Volume 1 of 2, at p. 2. A second copy of the indictment against petitioner appears among the state court records relating to petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), Volume I, at p. 2.

**10.** Trial Transcript, Volume 1 of 2, at pp. 78–79. The verbatim transcription of petitioner's first competency hearing, which in accordance with Texas law constituted a full-blown jury trial, appears at S.F. Trial, Volumes 5 & 6.

**11.** Trial Transcript, Volume 1 of 2, at pp. 80–81.

**12.** Trial Transcript, Volume 1 of 2, at pp. 86–80.

**13.** Trial Transcript, Volume 1 of 2, at pp. 105–06.

**14.** The law enforcement officer who videotaped the crime scene, i.e., made State Exhibit no.1, which was played for the jury, opined that the blood pooling beneath Keeran's body suggested that Keeran fell where he had been shot. S.F. Trial, Volume 24, testimony of Kenneth Wayne Crosthwait, at pp. 159–64.

**15.** S.F. Trial, Volume 24, testimony of William Charles Bunker, Jr., at pp. 71–100.

petitioner and Reneau planned to rob the gas station, (3) Reneau insisted that he carry a gun during the robbery, (4) the plan was for Reneau and petitioner to rob the store before the banks opened on January 2 because they had learned from store employees that a large sum of cash would be in the safe at that time, (5) Reneau and petitioner went to the store the afternoon before the robbery to talk with Keeran and learned that Keeran would not cooperate with their planned robbery, and (6) when Reneau and petitioner left their home at approximately 5:30 a.m. on January 2, 1996, she believed they were headed to Devine.[16]

On the morning of February 25, 1998, after deliberating less than ninety minutes, the jury returned its verdict, finding petitioner guilty of capital murder.[17]

E. *Petitioner's Requests to Discharge Counsel and Proceed Pro Se*

Immediately after the trial judge excused the jury for the remainder of the day, the petitioner requested to address the court. At that point, the following exchange occurred:

THE COURT: Let me—before you address the Court, if you say something, you know, I suppose it's possible that it could be used against you. I would advise you, you know, to not say anything until you have first talked to counsel first and they know what you're going to say and they have told you they think it's in your best interest to say it. Did you talk to your counsel about what you're going to say?

THE DEFENDANT: Yes, sir.

THE COURT: And after consulting them, you still want to make a statement?

THE DEFENDANT: Yes, sir.

THE COURT: All right, go ahead, Mr. Wood.

THE DEFENDANT: I want to fire both of my lawyers right now.

THE COURT: You want to represent yourself in punishment phase of the trial?

THE DEFENDANT: Yes, sir.

THE COURT: Can you tell me why you want to do that?

THE DEFENDANT: They have done their job. I just—I ain't going forty years for something I didn't do.

THE COURT: I know that you understand this, but I need to say it on the record, that the big issue is the death penalty.

THE DEFENDANT: That's true.

THE COURT: And the State is going to call an expert witness and based on your background and your experience, I don't think that you have the capability of examining—cross-examining an expert witness.

THE DEFENDANT: I ain't going to cross-examine nobody. I'm just going to let them do what they want. They can call anybody they want. I'm not going to ask them any questions.

THE COURT: Why is it that you do not want your attorneys to be with you when you take this position?

THE DEFENDANT: I just—like I said, I've got my mind set and it's set. I don't want them to sit there and represent me and not sit there and not say nothing on my behalf, because, I mean, I don't think they would do it, anyway.

THE COURT: Mr. Wood, you control your defense. You know, attorneys

---

**16.** S.F. Trial, Volume 25, testimony of Nadia Jean Mireles, at pp. 82–87 & 91–97.

**17.** S.F. Trial, Volume 26, at pp. 46–47; Trial Transcript, Volume 2 of 2, at pp. 299–300.

ultimately are going to have to follow your lead as to what you want to do. They can't overrule you. Have you talked to your attorneys about doing what you want to do?

THE DEFENDANT: Yes, sir.

THE COURT: And have they said they can't do that? Well, I don't want to put you in the position of saying that. I'm going to be a lot more comfortable if you have them with you doing what you want to do as opposed to you being by yourself doing what you want to do.

THE DEFENDANT: I would prefer not to. I don't want to put them on the burden where they feel like thirteen years down the road or twelve years down the road if they ever try to hang me, to put then on the burden where they didn't try something for me.

THE COURT: I'm going to deny your request to represent yourself in the second phase. The issue, especially the death penalty issue, is so intense from both an emotional standpoint and a legal standpoint, that I don't feel comfortable with you understanding all the concepts of what's going on and not having legal counsel that you can rely on.

THE DEFENDANT: I do.

THE COURT: But I'm going—I'm going to tell you that once again that you need to direct your attorneys on how you want them to prepare your defense or how you want them to react to evidence and then rely on their expertise in doing what you want to do, but I'm going to deny your request to fire your attorneys.

Is there anything else, Mr. Monroe?

MR. MONROE: Well, yes, Your Honor, there is. I certainly understand the Court's ruling. Now, Mr. Whitlow and I are in a very untenable position due to instructions that the Court has made and instructions that Mr. Wood has given us in other areas, because they're conflicting and we are in a very awkward spot. I really don't even know how to address it. Can I confer with Mr. Whitlow for just a second?

THE COURT: Yes.

(At which time defense counsel conferred off the record.)

MR. MONROE: Mr. Wood advised us he does not wish to cross-examine any of the State's witnesses, not does he wish to call any witnesses on his behalf in punishment. He has instructed us to discharge Dr. Coons and make no attempt to prepare for cross-examination of Dr. Grigson. I mean, I respect the court stating that we're still of record as his attorney, but I'm now on the horns of a dilemma as do I follow the Defendant's instructions in that respect or not that is coming of Monday. I advised the defendant that I did not want to sit here and participate, if that was his decision, but that I would, if that what it was—if that's the way it was, but the Court can understand the dilemma Mr. Whitlow and I are in now.

THE COURT: Right.

MR. MONROE: So we almost need to have those instructions made of record.

THE COURT: Well, if you want to do that with your client, that's fine. If you want to do it in open court, that's fine, or if you want to do it outside of the open court back in chambers, you can do that. I do think that it's probably fortuitous that we're going Monday, because you and Mr. Whitlow may want to look at some case law and authority in situations where the defendants have wanted to enter pleas of guilty or not fight certain punish-

ment issues and what counsel is supposed to do when they receive those kind of directions from their client, and you may want to take a look at that, and it's your client and your call whether or nor you want to bring Dr. Coons or cross-examine anybody. I can't tell you to do or not to do it.

MR. MONROE: Well, our desire, Mr. Whitlow's and I's [sic] desire for punishment in this case and Mr. Wood's are diametrically opposed and therein is the dilemma. What we would do to defend someone to try to save their life, we have been instructed not to do. That puts us in a very difficult situation. I did not want to get into a situation where we started researching the law to assist us in covering ourselves in Mr. Wood's decision and I hoped to avoid that. Of course, if the Court tells us to do, then that's what we will do. Like I said, it's a very difficult position to be in and Mr. Whitlow and I have discussed this at considerable length and we were advised of the possibility quite sometime ago. This is not a knee-jerk reaction on the part of this Defendant under any circumstances.

I don't know what else to tell you, Judge, other than we're just in a very difficult position.

THE COURT: It's a real sensitive issue because you have your relationship with your client.

MR. MONROE: Yes.

THE COURT: That you don't want to jeopardize any client/attorney privilege that you have. You know, if the Defendant would have wanted to do his own defense and had theories about how he wanted to conduct his own defense, I think I would have to go through a very slow process of determining whether or not he had voluntarily decided to waive his right to counsel and had the ability to go ahead and present his own defenses, but it appears, kind of reading through the lines, that Mr. Wood wants to not put—to not defend himself.

MR. MONROE: That's correct.

THE COURT: And if he doesn't want to defend himself, I want him to have counsel to tell him what that means and to explain to him what his options are if he doesn't want to examine a witness, what that means by not cross-examining or calling a witness, and so I want him to have attorneys there telling him what everything means, every step when you're making this decision, and I want to offer to you that as we go through this at any time that you need to put anything on the record, you can just stop and tell me we need to go back in chambers with just our client and talk about something and put it on the record, and I understand that and you can do that at any time.

I'm going to stay with my prior ruling of not allowing Mr. Wood to represent himself and keeping you and Mr. Whitlow on the case, but I would welcome you to take a look at this issue and see if you can find any precedent for it in the next two to three days.

We're going to be here tomorrow doing criminal pretrials in case you need to come back over and see the Court and Mr. Wood needs to stay here in Bandera until Monday, and so I'll be here tomorrow. Friday I'll be in Austin. I have a court administration meeting, but if it's an emergency, well, we'll get back together if I have to come back.

Otherwise, I plan on seeing everybody Monday morning at 9:00 o'clock. We'll start the punishment phase.[18]

18. S.F. Trial, Volume 26, at pp. 50–57.

That same date, petitioner and his trial counsel conferred in chambers with the court reporter present.

During the first of those conferences, which occurred while the jury was still deliberating at the guilt-innocence phase of petitioner's capital murder trial, petitioner made it very clear that (1) he did not want his trial counsel to do anything that might result in petitioner receiving a life sentence, (2) he wished to be instructed in the procedures to be followed in order to have his trial counsel discharged, (3) he understood that firing his attorneys would not improve the posture of his appeal in the event he were convicted of capital murder, (4) he understood that both his trial counsel were morally opposed to serving as mere "standby counsel" if petitioner chose not to defend himself at the punishment phase of trial, (5) he did not wish his trial counsel to call Dr. Richard Coons to testify on petitioner's behalf at the punishment phase of trial, (6) he did not wish his trial counsel to cross-examine the prosecution's expected expert witness, Dr. Grigson, and (7) he did not wish to reconsider his decision not to mount a defense at the punishment phase of trial because he did not wish to serve forty years in prison "for something I didn't do." [19]

During the second such conference, which occurred shortly after the jury had returned its guilty verdict and the trial court denied petitioner's first request to discharge his trial counsel in the exchange quoted above, petitioner once more instructed his trial counsel that (1) he wished his trial counsel to discharge Dr. Coons and not call any expert witnesses to testify during the punishment phase of petition-

er's capital murder trial, (2) he understood his rights with regard to whether he would submit to an interview by Dr. Grigson, (3) he did not wish his trial counsel to cross-examine Dr. Grigson, (4) he did not wish his trial counsel to call any of his family members or any other witnesses to testify on petitioner's behalf at the punishment phase of trial, and (5) he understood there was an extremely high likelihood that the jury would impose a death sentence if petitioner persisted in his decision not to offer a defense at the punishment phase of trial.[20]

The following day, February 26, 1998, petitioner filed a type-written, *pro se* motion waiving his right to counsel and requesting to proceed *pro se* during the punishment phase of his trial.[21]

On March 2, 1998, immediately before the state of the punishment phase of petitioner's capital murder trial, petitioner again met with his trial counsel in chambers and (1) instructed his trial that counsel that they were not to object to any evidence proffered by the prosecution and were to stand silent with regard to any and all prosecution evidence, (2) stated that he understood that such a strategy would waive any objection to inadmissible evidence offered by the prosecution, (3) instructed his trial counsel not to cross-examine any prosecution witnesses, (4) instructed his trial counsel not to call any witnesses on petitioner's behalf, including Dr. Coons, (5) instructed his trial counsel not to offer any mitigating evidence at the punishment phase of trial, (6) instructed his trial counsel not to do anything that might result in petitioner receiving a life

19. S.F. Trial, Volume 27, at pp. 4–10.

Volume 27–29 & 31 of the Statement of Facts from petitioner's trial were not included among the state court records submitted to this Court by respondent on April 10, 202. However. each of those volumes were at-

tached to the Respondent's Advisory to the Court, filed May 23, 203, docket entry no. 22.

20. S.F. Trial, Volume 28, at pp. 4–7.

21. Trial Transcript, Volume 2 of 2, at pp. 287–88.

sentence, (7) informed his trial counsel that he did not wish to reside in prison for forty years, (8) stated that he believed he was competent to make such a choice, (9) advised his trial counsel that they could file objections to the punishment phase jury charge, (10) stated that he understood his trial counsel could present evidence that might result in petitioner receiving a life sentence, (11) stated that he understood the likelihood of him prevailing on appeal was not good, (12) stated that he understood that, if he were sentenced to death row, he would likely be executed, (13) stated that he understood the jury might not impose the death sentence regardless of what strategy his trial counsel employed at the punishment phase of trial, and (14) stated that he was satisfied with his trial counsel's performance.[22]

Shortly thereafter, before the jury was brought into the courtroom, the following exchange occurred in open court:

THE COURT: This is a hearing outside the presence of the jury and Mr. Wood filed a Waiver of Right to Counsel and request to proceed pro Se. It looks like it was last Friday.

THE DEFENDANT: Yes, sir.

THE COURT: Is that your request, Mr. Wood.

THE DEFENDANT: Yes, sir.

THE COURT: Why do you want to proceed pro se?

THE DEFENDANT: I just feel like it's a personal reason I can't get into. I would prefer to have a death penalty instead of life in prison.

THE COURT: Do you think your attorneys are hindering you in getting whatever result you want?

THE DEFENDANT: What is that?

THE COURT: Are they making it hard for you to present what you want to present or not present what you want to present?

THE DEFENDANT: No, they said it's my opinion and, I mean, they would prefer it the other way, but, I mean, they agree with what I have to do.

THE COURT: They're cooperating with you?

THE DEFENDANT: Yes, in every way.

THE COURT: Based on the testimony I've heard about your educational background and your experience with the criminal justice system, I'm of the opinion that you still need to have counsel with you that you could ask questions of and make sure that you know what's going on and that you're not taken advantage of by this proceeding, so I note that you have requested to represent yourself and I'm going to deny that request and continue these gentlemen as your counsel and you have the advantage of calling on them whenever you want to call them during this punishment phase of trial.

THE DEFENDANT: All right.

THE COURT: Thank you, Mr. Wood.

MR. MONROE: Can Mr. Whitlow and I just say something for the record, too, not necessarily with respect to this? We have been shown case law that indicates, Your Honor, that the failure of Mr. Whitlow and I to abide by a client's instructions in this case, Mr. Wood's, unless those instructions are illegal, the failure to abide by them is unethical. We take exception to that. * * *

THE COURT: All right, go ahead, Mr. Monroe.

MR. MONROE: We take exception to that. We feel like in spite of the case law, that it is unethical for us to—not necessarily unethical. It's—it goes

22. S.F. Trial, Volume 29, at pp. 4–11.

against our morals to assist Mr. Wood in basically what we consider to be a gesture of suicide. We understand what the case law says and we will do as the case law has instructed us and as the Court has instructed us, but we want the court to understand that we do no condone this and just wanted to state that for the record.[23]

### F. Punishment Phase of Trial

At the punishment phase of petitioner's capital murder trial, the prosecution presented evidence, including petitioner's hand-written confession, implicating petitioner and Reneau in the armed robbery of a grocery store in Kerrville on November 30, 1995, slightly more than a month before Keeran's murder.[24]

The prosecution called the Kerr County Sheriff, the administrator of the Kerr County Jail, and a jailer at that facility to testify regarding (1) an incident on December 29, 1996 in which petitioner and Reneau were observed standing on the sinks in their respective cells talking to each other through an air vent about a possible car-jacking should they successfully escape from the jail,[25] (2) an incident on February 29, 1996 in which petitioner (a) reacted violently to a denial (pursuant to jail policy) of his request that jail officials transfer funds from his inmate account into Reneau's account, (b) insisted on pressing the emergency buzzer in his cell and refused to cease doing so when directed to stop by jail personnel, (c) even more violently resisted the efforts of jail employees to move him to a detoxification cell, (d) assaulted one of the guards who moved petitioner on that date, and (e) threatened to kill several of the jail employees who finally did manage to move him,[26] and (3) a letter petitioner wrote to Reneau while they were both inmates at the Kerr County Jail in which petitioner bragged about filing charges against the guards who had moved him and indicated that he planned to "go

---

23. S.F. Trial, Volume 30, at pp. 9–11.

24. More specifically, a grocery store employee testified that (1) at approximately 10:30 p.m. on November 30, 1995, a gunman wearing two bandanas on his head and face approached him, pointed a gun at his head, and directed him to give him all the money in the safe, (2) the gunman then directed him back into the store's office and tore out the store's phone line, and (3) the store's security camera recorded the robbery. S.F. Trial, Volume 30, testimony of Erin Lee Bailey, at pp. 16–20.

A Criminal Investigator for the Kerr County District Attorney testified that (1) he obtained a copy of the store's surveillance camera tape recording of the robbery and had a reduced-speed version of same made, which he identified as State Exhibit no. 50, (2) he spoke with petitioner on January 4, 1996 regarding the robbery in question, (3) on that same date petitioner gave a voluntary, handwritten statement (State Exhibit no. 51) in which petitioner confessed that he drove Reneau to and from the robbery on November 30, 1995 and that he anticipated that Reneau would rob the store, and (4) on January 17, 1996, Reneau accompanied him to the scene of the robbery and helped locate evidence. S.F. Trial, Volume 30, testimony of William R. Hierholzer, at pp. 21–37.

Petitioner's hand-written statement, i.e., State Exhibit no. 51, was admitted into evidence and read in open court. Id., at pp. 36–37. A copy of petitioner's statement also appears in S.F. Trial, Volume 33. In his statement, petitioner admitted that (1) he dropped off the armed Reneau at the store on November 30, 1996, (2) he believed that Reneau was going to rob the store because of the late hour and the fact Reneau was armed and carrying two bandanas, (3) he picked up Reneau shortly thereafter, and (4) at that time, Reneau was still carrying the bandanas and gun, as well as money and a trash bag, (4) he did not receive any of the proceeds from that robbery, but (5) he did drive Reneau back to Reneau's home.

25. S.F. Trial, Volume 30, testimony of Kenneth Gene Lipscomb, at pp. 40–44.

26. Id., testimony of Carol Lynn Twiss, at pp. 40–52.

places" once he was released on bond.[27]

Finally, the prosecution called Dr. James P. Grigson, who testified that, in his opinion (1) the petitioner would most certainly commit future acts of violence and did represent a threat to society, (2) petitioner's attention deficit disorder did not cause petitioner's criminal behavior, and (3) petitioner had experienced difficulty controlling his anger throughout his years in school.[28]

Petitioner's trial counsel did not cross-examine any of the prosecution's punishment-phase witnesses and offered no evidence on petitioner's behalf. During yet another in-chambers conference held immediately after both parties closed at the punishment phase of trial, petitioner (1) stated that his trial counsel had done precisely as he had directed them at the punishment phase of trial and (2) directed his trial counsel not to present any argument on petitioner's behalf.[29]

After the prosecution made its closing argument, the jury deliberated slightly more than an hour before it returned its verdict at the punishment phase of trial, finding (1) beyond a reasonable doubt there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society, (2) petitioner either actually caused Kriss Keeran's death or intended to kill Keeran or another or anticipated that a human life would be taken, and (3) beyond a reasonable doubt there were insufficient mitigating circumstances to warrant a life sentence.[30] Based on the jury's findings, that same date, the trial court imposed a sentence of death.[31]

### G. Direct Appeal

Petitioner appealed his conviction and sentence but, in an opinion issued May 24, 2000, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence.[32] Petitioner did not thereafter seek review of that decision by the United States Supreme Court via petition for certiorari.

### H. State Habeas Corpus Proceeding

On March 27, 2000, while his direct appeal was still pending, petitioner filed an application for state habeas corpus relief in which he presented twenty-nine claims for relief.[33]

27. *Id.*, testimony of Francis A, Kaiser, at pp. 54–56.

Petitioner's letter to Reneau was admitted into evidence as State Exhibit no. 54 and read in open court. *Id.*, at pp. 56–57. A copy of that exhibit appears in S.F. Trial, Volume 33.

28. *Id.*, testimony of Dr. James P. Grigson, at pp. 58–73.

29. S.F. Trial, Volume 31, at pp. 4–6.

30. S.F. Trial, Volume 30, at pp. 85–86; Trial Transcript, Volume 2 of 2, at pp. 319–21 & 324–25.

31. S.F. Trial, Volume 32, at pp. 5–6.

32. *Wood v. State*, 18 S.W.3d 642 (Tex.Crim. App.2000).

33. State Habeas Transcript, Volume I, at pp. 8–184.

As grounds for relief, petitioner argued that (1) his trial counsel rendered ineffective assistance by (a) failing to present mitigating evidence at the punishment phase of petitioner's trial, (b) relying on federal case law that was objectively unreasonable, to wit, the Fifth Circuit's opinion in *Autry v. McKaskle*, 727 F.2d 358 (5th Cir.1984), a pre-*Strickland* opinion, and its progeny, and (c) relying on objectively unreasonable state case law, to wit, *Duncan v. State*, 717 S.W.2d 345 (Tex.Crim.App.1986), (2) petitioner's trial counsel's ineffective assistance violated the Texas Constitution, (3) his appellate counsel rendered ineffective assistance by failing to raise points of error on direct appeal complaining about (a) the failure of his trial counsel to present mitigating evidence and (b) trial court's denial of his requested jury instruction regarding the definition of "duress," (4) the trial court erred in denying his motion for mistrial during the second competency hearing based on the

In an Order issued October 2, 2000, the state habeas trial court made its findings of fact, conclusions of law, and recommendation that petitioner's state habeas corpus application be denied.[34] In pertinent part, the state habeas trial court concluded that (1) petitioner's trial counsel rendered effective assistance in view of petitioner's specific directives regarding the manner in which petitioner wanted his defense conducted during the punishment phase of trial, (2) the objective standard of reasonable firmness contained in the statutory definition of the affirmative defense of "duress" did not offend equal protection principles, (3) petitioner's request to represent himself was untimely and the trial court properly denied same, (4) Article 37.071,

§ 2(f)(4) does not limit the definition of "mitigating evidence" to only that evidence which diminishes the defendant's moral blameworthiness, and (5) petitioner failed to allege any facts showing that he was prejudiced by the statutory definition of "mitigating evidence" included in his punishment-phase jury instructions.

In an unpublished Order issued May 9, 2001, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied state habeas corpus relief.[35]

### I. Federal Court Proceedings

Petitioner filed his initial federal habeas corpus petition in this Court on January 31, 2002, arguing therein that (1) his trial

prosecution's mental health expert's failure to produce raw data for cross-examination, (5) the trial court erred in permitting Dr. Grigson to testify at the punishment phase of trial, (6) the trial court erred in denying petitioner's requested definition of "duress," (7) the trial court erred in failing to sufficiently determine whether petitioner could defend himself, (8) Article 46.04 of the Texas Penal Code is unconstitutional, (9) petitioner is incompetent to be executed, (10) the "aggravating factors" employed in the Texas capital sentencing special issues are unconstitutionally vague, (11) the absence of meaningful appellate review renders the Texas capital sentencing scheme unconstitutional, (12) Article 37.071, § 2(e) of the Texas Code of Criminal procedure is unconstitutional because it does not prescribe a burden of proof, (13) the twelve/ten rule contained in Article 37.071 is unconstitutional, (14) the failure to advise the jury of the effect of a single hold-out juror at the punishment phase of trial violates the Eighth Amendment, (15) the open-ended discretion given juries under the Texas capital sentencing scheme violates the Eighth Amendment, (16) the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow, (17) as administered, the Texas capital sentencing scheme is unconstitutional, (18) as administered the Texas capital sentencing scheme violates the Texas Constitution, (19) the time limits contained in the Texas state habeas corpus statute violate various provisions of

the Texas Constitution, as well as the separation of powers doctrine, (20) the use of several different capital sentencing schemes in Texas over the years renders petitioner's death sentence arbitrary and capricious, (21) the trial court erred in failing to instruct the jury regarding the definitions of several vague terms employed in the Texas capital sentencing special issues, (22) the trial court erred in failing to hold Article 37.071 unconstitutional with regard to the Texas law of parties, (23) the trial court erred in denying petitioner's objection to the prosecution's untimely addition of Dr. Grigson to its witness list, and (24) the objective reasonableness standard for the affirmative defense of duress set forth in Section 8.05 of the Texas penal code is unconstitutional.

**34.** State Habeas Transcript, Volume III, at pp. 3–15.

**35.** Ex parte Jeffery Lee Wood, App. No. 45,-500–01 (Tex.Crim.App. May 9, 2001). The copy of this Order included in the state court papers relating to petitioner's state habeas corpus proceeding presented to this court by respondent includes an obvious typographical error stating that Order had been issued on May 9, 2000. However, the hand-written notation on the cover-sheet to petitioner's state habeas corpus pleadings indicates petitioner's state habeas corpus application was denied May 9, 2001.

counsel rendered ineffective assistance by following petitioner's directives and not mounting a defense at the punishment phase of trial, (2) the trial court erred in failing to sufficiently determine whether petitioner could represent himself, (3) the Texas capital murder statute's definition of "mitigating evidence" unconstitutionally narrows that term to include only evidence reducing the defendant's moral blameworthiness, (4) the trial court erred when it failed to specifically determine whether the petitioner was competent to instruct his trial counsel not to present mitigating evidence, and (5) the objective standard of reasonable firmness included in the Texas statutory definition of the affirmative defense of "duress" is unconstitutional.[36]

On April 8, 2002, respondent filed an answer and motion for summary judgment, arguing, in pertinent part, that (1) petitioner's ineffective assistance complaint herein is substantially dissimilar from the analogous complaint petitioner presented to the state habeas court to be unexhausted and, therefore, procedurally defaulted, (2) petitioner's requests to proceed *pro se* were untimely, (3) all of the mitigating evidence presented by petitioner was within the scope of the jury's consideration under the submitted capital sentencing special issues, (4) petitioner failed to exhaust state remedies and, thereby, procedurally defaulted, on his complaint regarding the trial court's failure to ascertain petitioner's competence to direct his trial counsel to sit on their hands during the punishment phase of trial, and (5) the Texas statutory definition of mitigating evidence is constitutional.[37]

Subsequently, petitioner filed a response to respondent's motion for summary judgment and a supplemental brief on the "duress" issue.[38]

**36.** Docket entry no. 11.

**37.** Docket entry no. 12.

## II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); and 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the govern-

**38.** Docket entry nos. 23 & 25.

ing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does *not, per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

■■■■ Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable and an "unreasonable" application is different from a merely incorrect one. *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner.") Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, ——, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings, requiring that a petitioner challenging state court factual findings establish by clear and convincing evidence that the state court's findings were erroneous. *See Morrow v. Dretke,* 367 F.3d 309, 315 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 421, 160 L.Ed.2d 325 (2004)("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.'"); *Pondexter v. Dretke,* 346 F.3d 142, 146 & 149 (5th Cir.2003), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004) (holding that, pursuant to § 2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence); *Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir.2003), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004), (holding the same); 28 U.S.C. § 2254(e)(1).

### III. *Ineffective Assistance Claim*

A. *The Claim*

In his first claim herein, petitioner argues that (1) petitioner's trial counsel rendered ineffective assistance by (a) failing to present mitigating at the punishment phase of trial, (b) relying on petitioner's directives and inapplicable state and federal case law, and (c) failing to obtain on-the-record determinations of petitioner's competence to waive his right to present a defense at the punishment phase of trial, as well as the voluntary, intelligent, and knowing nature of such waiver, and (2)

petitioner is entitled to a presumption of prejudice based on his trial counsel's *de facto* abandonment of petitioner at the punishment phase of trial.[39]

In response, respondent argues that (1) petitioner's initial claim herein is significantly different from the ineffective assistance claim petitioner presented during his state habeas corpus proceeding and, thus, unexhausted, (2) petitioner thereby procedurally defaulted on this new ineffective assistance claim, and (3) petitioner's complaints about his trial counsel's performance fail to satisfy either prong of the *Strickland v. Washington* standard for proving ineffective assistance.[40]

## B. *The Constitutional Standard*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding that the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland*

---

**39.** Petitioner's Initial Application [sic] for Writ of Habeas Corpus, filed January 31, 2002, docket entry no. 11 (henceforth "Petition"), at pp. 22–57.

**40.** Respondent's Answer and Motion for Summary Judgment, filed April 8, 2002, docket entry no. 12, at pp. 22–48.

*v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

C. *Failure to Exhaust Results in Procedural Default*

1. *Failure to Exhaust New Legal and Factual Theories*

Respondent correctly points out that the ineffective assistance claim petitioner presents to this Court is substantially and significantly different from the analogous claim petitioner included in his state habeas corpus application as his first ground for state habeas corpus relief. In his state habeas application, petitioner argued that his trial counsel's failure to present mitigating evidence constituted ineffective assistance under the dual prongs of·*Strickland* because· said counsel's reliance on both state and federal case law suggesting that a trial counsel must follow the directions of his or her client on such issues as whether to present mitigating evidence was objectively unreasonable and prejudiced petitioner.[41] In contrast, petitioner's first claim for federal habeas corpus relief herein includes arguments that (1) before complying with petitioner's directives that no mitigating evidence and no defense be offered at the punishment phase of petitioner's trial, petitioner's trial counsel were obligated to ensure that petitioner was competent to give such directives and obtain an on-the-record determination from the trial court that petitioner's waiver of the right to present a defense at the punishment phase of trial was voluntary, intelligent, and knowing, and (2) petitioner's trial counsel's failure to do so constituted an abandonment of petitioner warranting a presumption of prejudice. Petitioner presented none of these arguments to his state habeas court. By urging in this Court for the first time his (1) his "presumption of prejudice" theory, (2) complaint about his trial counsel's failure to obtain a trial court ruling regarding petitioner's competence to waive presentation of a defense at the punishment phase of trial, and (3) complaint that his trial counsel failed to obtain an on-the-record determination that such waiver was voluntary, intelligent, and knowing, petitioner has presented this Court with substantially different legal and factual theories underlying his complaint regarding his trial counsel's failure to present mitigating evidence than the legal and factual theories that underlay his analogous state habeas claim. Thus, the ineffective assistance claim petitioner presents to this Court is substantially and significantly different from the ineffective assistance claim petitioner "fairly presented" to his state habeas court.

2. *Procedural Default May Arise from a Failure to Exhaust*

██ · Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural·rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999).

3. *The Nature of the Exhaustion Requirement*

██ Before seeking federal habeas corpus relief, a state prisoner must exhaust

**41.** State Habeas Transcript, Volume I, at pp. 17–26.

available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(1). To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844–45, 119 S.Ct. at 1732–33 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162–63, 116 S.Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S.Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); *Duncan v. Walker*, 533 U.S. 167, 179, 121 S.Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

■ Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir.2003), cert. denied, —— U.S. ——, 125 S.Ct. 250, 160 L.Ed.2d 56 (2004), ("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."); *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir.2003); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir.2003); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir.2003), cert. denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 293 (2003), ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."); *Mercadel v. Cain*, 179 F.3d 271, 276–77 (5th Cir.1999); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir.1998); and *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir.1998), cert. denied, 528 U.S. 895, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999). However, Title 28 U.S.C. § 2254(b)(2) empowers a federal habeas court to deny an exhausted claim on the merits. *Smith v. Cockrell*, 311 F.3d 661, 684 (5th Cir.2002), cert. dism'd, 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Daniel v. Cockrell*, 283 F.3d 697, 701–02 (5th Cir.2002), cert. denied, 537 U.S. 874, 123 S.Ct. 286, 154 L.Ed.2d 126 (2002). The exhaustion of *all* federal

claims in state court is a fundamental prerequisite to requesting federal collateral relief under Title 28 U.S.C. Section 2254. *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir.2001); *Sterling v. Scott,* 57 F.3d 451, 453 (5th Cir.1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996); and 28 U.S.C. § 2254(b)(1)(A).

■ In order to "exhaust" available state remedies, a petitioner must "fairly present" *all* of his claims to the state courts. *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor,* 404 U.S. at 270, 275–76, 92 S.Ct. 509, at 512–13, 30 L.Ed.2d 438 (1971); *Kunkle v. Dretke,* 352 F.3d at 988; *Riley v. Cockrell,* 339 F.3d at 318; *Anderson v. Johnson,* 338 F.3d at 386; *Jones v. Jones,* 163 F.3d at 296; and *Shute v. State of Texas,* 117 F.3d at 237: "a habeas petitioner 'must fairly apprize [sic] the highest court of his state of the federal rights which were allegedly violated.' " In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *See Richardson v. Procunier,* 762 F.2d 429, 431–32 (5th Cir. 1985).

More simply, the exhaustion doctrine requires that the petitioner present his *federal* claim in a manner reasonably designed to afford the State courts a meaningful opportunity to address same. The Supreme Court has succinctly explained the rationale behind the exhaustion requirement:

Exhaustion means more than notice. In requiring exhaustion of a federal claim in state court, Congress meant that exhaustion be serious and meaningful.

The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court. Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claim on the merits.

*Keeney v. Tamayo–Reyes,* 504 U.S. 1, 10, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992).

The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court, i.e., the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain,* 298 F.3d 361, 364 (5th Cir.2002), *cert. denied,* 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003); and *Mercadel v. Cain,* 179 F.3d at 275. However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell,* 339 F.3d at 318; *Fisher v. Texas,* 169 F.3d 295, 303 (5th Cir.1999).

■ The presentation of claims for the first time on discretionary review to the state's highest court does *not* constitute "fair presentation" for exhaustion purposes. *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380

(1989); *Satterwhite v. Lynaugh,* 886 F.2d at 92. Full exhaustion of *all* claims presented is required before federal habeas corpus relief is available. *Rose v. Lundy,* 455 U.S. 509, 518–22, 102 S.Ct. 1198, 1203–05, 71 L.Ed.2d 379 (1982); and *Thomas v. Collins,* 919 F.2d at 334.

■ Significantly for purposes of this cause, the exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless,* 459 U.S. 4, 6–7, 103 S.Ct. 276, 277–78, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell,* 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell,* 274 F.3d at 259, ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); and *Finley v. Johnson,* 243 F.3d 215, 219 (5th Cir.2001). Likewise, to have "fairly presented" his *federal* claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin v. Reese,* 541 U.S. at 29–32, 124 S.Ct. at 1349–51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Wilder v. Cockrell,* 274 F.3d at 260: "A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights."

### 4. *Procedural Default on Petitioner's Unexhausted Claim*

■ Petitioner's first claim herein presents a plethora of new legal and factual theories which petitioner never presented to the state courts in either his direct appeal or in his state habeas corpus proceeding. More specifically, petitioner argues before this Court that he is entitled to a presumption of prejudice under the Supreme Court's opinions in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). This is an entirely new legal theory which petitioner failed to "fairly present" to the state habeas court. Likewise, insofar as petitioner argues that his trial counsel's failure to present mitigating evidence was objectively unreasonable *because* petitioner's trial counsel failed to obtain trial court determinations that petitioner was competent to waive his right to present a defense and that such waiver was voluntary, intelligent, and knowing, those mixed factual and legal theories were not included in any form in petitioner's state habeas corpus application. Instead, petitioner's state habeas application focused exclusively on the objective reasonableness of his trial counsel's decision not to present mitigating evidence in light of then-existing state and federal case law. Nothing in petitioner's state habeas pleadings "fairly presented" the state habeas court with any argument suggesting that petitioner's trial counsel were required to obtain such determinations before they could comply with petitioner's suicidal directives.

No external impediment prevented petitioner from urging any of his new legal or factual theories for relief during his state habeas corpus proceeding. The Supreme Court's holdings in *Cronic* and *Cuyler* both predated the filing of petitioner's state ha-

beas application by many years and, thus, were "available" to petitioner at the time he filed his state habeas corpus application. With the exception of the Fifth Circuit's opinion in *Burdine v. Johnson,* 262 F.3d 336 (5th Cir.2001), *cert. denied,* 535 U.S. 1120, 122 S.Ct. 2347, 153 L.Ed.2d 174 (2002), all of the opinions petitioner relies on in support of his "presumption of prejudice" legal theory were available at the time petitioner filed his state habeas application. The Fifth Circuit made clear in *Burdine,* however, that the presumption of prejudice it applied in that case was not a "new rule" but based on long-established legal principles. *See Burdine v. Johnson,* 262 F.3d at 347–48 (rejecting the contention that the *Teague* non-retroactivity doctrine barred application of a presumption of prejudice arising from trial counsel's alleged sleeping during a critical juncture during trial).

Likewise, the case law petitioner relies on in support of his contentions that his trial counsel were required to obtain judicial determinations of petitioner's competence to waive the presentation of a defense at the punishment phase of trial and the voluntary, intelligent, and knowing nature of such a waiver before complying with same were all available to petitioner at the time he filed his state habeas corpus application.

Petitioner failed to "fairly present" the state habeas court with the same legal and factual theories in support of his ineffective assistance claim that he has presented to this Court. Texas law prohibits the filing of a successive state habeas corpus application except in rare circumstances inapplicable to any of petitioner's claims herein. *See Bagwell v. Dretke,* 372 F.3d 748, 756 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004), (holding that Texas law, specifically Section 5 of Article 11.071, Texas Code of Criminal Procedure, bars successive state

habeas applications except where (1) the claim could not have been presented in the initial state habeas application because the factual or legal basis of the claim was unavailable at the time, and either (2) the petitioner shows by a preponderance of the evidence that, but for the constitutional violation, he would not have been convicted, or (3) the petitioner shows by clear and convincing evidence that, but for the constitutional violation, no rational jury would have answered in the state's favor on one or more of the capital sentencing special issues); Article 11.071, § 5(a), Tex.Code Crim. Proc. Ann. (Vernon Supp.2004). The Fifth Circuit has consistently held that federal habeas review of unexhausted claims presented by a convicted Texas capital murder defendant is barred under the procedural default doctrine. *See, e.g., Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005), (holding that violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim); *Bagwell v. Dretke,* 372 F.3d at 755–56 (holding that a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application); *Cotton v. Cockrell,* 343 F.3d 746, 755 (5th Cir.2003), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2001), (holding the Texas writ-abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims).

Because petitioner failed to exhaust available state habeas remedies with regard to the legal and factual theories underlying his ineffective assistance claim herein, and because Texas law prohibits petitioner from returning to state court to seek state habeas relief on the unexhausted legal and factual theories underlying his initial claim herein, petitioner has proce-

durally defaulted on his first claim for federal habeas relief herein. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640.

For the foregoing reasons, petitioner has procedurally defaulted on his unexhausted, but otherwise compelling, argument that the complete failure of petitioner's trial counsel to cross-examine prosecution witnesses, object to prosecution evidence, argue on petitioner's behalf, or present any mitigating evidence at the punishment phase of petitioner's capital murder trial warrants application of a presumption of prejudice under *Cronic* and *Cuyler*. The Supreme Court made clear in *Strickland* that a criminal defense counsel owes his client "the overarching duty to advocate the defendant's cause," as well as "the duty to bring to bear such skill and knowledge as will render the trial a reliable *adversarial* testing process." *Strickland v. Washington*, 466 U.S. at 688, 104 S.Ct. at 2065 (emphasis added). In fact, in *Strickland* the Supreme Court emphasized "the crucial role" played by criminal defense counsel to ensure a fair trial "in which evidence subject to adversarial testing is presented" and in which the defendant is afforded "ample opportunity to meet the case of the prosecution," in an adversarial context. *Id.*, 466 U.S. at 685, 104 S.Ct. at 2063. "[C]ounsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.*, 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner's trial counsel made no effort whatsoever at the punishment phase of petitioner's trial to fulfill the function of trial counsel as envisioned by the Supreme Court in *Strickland*. Both literally and figuratively, petitioner's capital murder trial ceased to be an adversarial proceeding once the jury returned its guilty verdict.

By completely and totally failing to ensure adversarial testing of the prosecution's case at the punishment phase of petitioner's trial, either through challenge to the prosecution's evidence, proper objection to obvious hearsay testimony, cross-examination of prosecution witnesses, presentation of rebuttal evidence, such as that which Dr. Coons was prepared to offer, or making argument on petitioner's behalf, petitioner's trial counsel abandoned their "overarching duty" to ensure that petitioner received a fair trial and turned the punishment phase of petitioner's trial into something that was as far from the "adversarial testing" proceeding envisioned by the Supreme Court in *Strickland* as is imaginable.

In *Bell v. Cone*, 535 U.S. 685, 695–96, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated its holding in *Cronic* that there are only three situations in which a presumption of prejudice is warranted: first, when there was complete denial of counsel at a critical stage; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, when counsel suffers from an actual conflict of interest. In every sense of the term, at the punishment phase of trial, petitioner's counsel failed to subject the prosecution's case to "meaningful adversarial testing."

The Fifth Circuit has consistently recognized that the decision to present or not present mitigating evidence during the punishment phase of a capital trial ordinarily falls within the broad parameters of a trial counsel's strategic or tactical decision-making authority. *See, e.g., Riley v. Cockrell*, 339 F.3d at 316–17 (holding trial counsel were not *per se* deficient in failing to present mitigating evidence); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003), *cert. denied*, 540 U.S. 968, 124 S.Ct.

430, 157 L.Ed.2d 314 (2003), (recognizing that the decision to present double-edged mitigating evidence lies within trial counsel's broad tactical or strategic discretion); *Smith v. Cockrell,* 311 F.3d at 669 (holding the failure to investigate, develop, and present mitigating evidence is not ineffective *per se* ); *Moore v. Johnson,* 194 F.3d 586, 615 (5th Cir.1999) (holding the failure to present mitigating evidence is not *per se* deficient performance); *Crane v. Johnson,* 178 F.3d 309, 314 (5th Cir.1999), *cert. denied,* 528 U.S. 947, 120 S.Ct. 369, 145 L.Ed.2d 285 (1999), (holding the same); *Rector v. Johnson,* 120 F.3d 551, 564 (5th Cir.1997), *cert. denied,* 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998), (holding the same); *Turner v. Johnson,* 106 F.3d 1178, 1188 (5th Cir.1997) (holding the failure to present mitigating evidence, if based on an informed and reasoned practical judgment, is well within the range of practical choices not to be second-guessed). Petitioner's trial counsel's failures went considerably farther than a mere failure to present available mitigating evidence or to argue for a life sentence, however.

Petitioner's trial counsel failed to cross-examine any prosecution witnesses and failed to present available rebuttal evidence, in addition to failing to present mitigating evidence or make any argument on petitioner's behalf. Petitioner's trial counsel essentially sat mute throughout the punishment phase of petitioner's trial. Petitioner's trial counsel made no effort to engage in any "adversarial testing" of the prosecution's evidence or argument at the punishment phase of petitioner's trial. Thus, under the holdings in *Cronic* and *Bell,* petitioner would arguably have been entitled to a presumption of prejudice with regard to his trial counsel's performance at the punishment phase of petitioner's trial had petitioner not procedurally defaulted on that contention by failing to present that argument during his state

habeas corpus proceeding. However, petitioner chose not to present this contention to the Texas Court of Criminal Appeals, either on direct appeal or in the course of petitioner's state habeas corpus proceeding. Instead, petitioner's state habeas corpus application focused on the decision by petitioner's trial counsel (in reliance on petitioner's directives and said counsel's interpretation of arguably inapplicable precedent) not to present mitigating evidence and ignored the more significant and substantial breach of professionally competent behavior by petitioner's trial counsel in completely failing to subject the prosecution's case to any meaningful adversarial testing. As a result, petitioner has procedurally defaulted on his unexhausted legal theory that he is entitled to a presumption to prejudice with regard to his complaints about his trial counsel's performance at the punishment phase of trial.

5. *Exceptions to Procedural Default Doctrine Inapplicable*

a. *Exceptions Identified*

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show cause and actual prejudice for his default or that failure to address the merits of his procedurally defaulted claim will work a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).

b. *No "Cause" or "Actual Prejudice"*

 To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at

2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine); *Matchett v. Dretke*, 380 F.3d at 848–49 (recognizing that ineffective assistance by counsel on direct appeal satisfies the "cause" portion of the "cause and actual prejudice" exception to procedural default); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir.2004), *cert. denied*, 541 U.S. 1087, 124 S.Ct. 2812, 159 L.Ed.2d 249 (2004), (recognizing that ineffective assistance satisfies the "cause" element of the "cause and actual prejudice" test); *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir.1997), (recognizing that proof of ineffective assistance will satisfy the cause test); *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir.1996) (holding the same); and *Hill v. Black*, 932 F.2d 369, 372–73 (5th Cir.1991)(holding the same).

■■■■ While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, errors by a petitioner's state habeas counsel cannot satisfy the first prong of the "cause and actual prejudice" exception because there is no constitutional right to the assistance of counsel in a collateral attack upon an otherwise final state criminal conviction. Both the Supreme Court and Fifth Circuit have held that because there is no constitutional right to the assistance of counsel in connection with a collateral attack upon an otherwise final conviction, errors by counsel in an earlier state or federal habeas proceeding cannot give rise to a federal habeas claim or constitute "cause" for purposes of avoiding a procedural default. *Coleman v. Thompson*, 501 U.S. at 755, 111 S.Ct. at 2567; *Matchett v. Dretke*, 380 F.3d at 849; *Bagwell v. Dretke*, 372 F.3d at 756; *Henderson v. Cockrell*, 333 F.3d at 606; *Martinez v. Johnson*, 255 F.3d 229, 239–41 (5th Cir.2001), *cert.*

*denied*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002); *In re Goff*, 250 F.3d 273, 275 (5th Cir.2001); *Beazley v. Johnson*, 242 F.3d 248, 270 (5th Cir.2001), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir.2001), *cert. denied*, 532 U.S. 1070, 121 S.Ct. 2226, 150 L.Ed.2d 218 (2001); *Fairman v. Anderson*, 188 F.3d 635, 642–44 (5th Cir. 1999); *Callins v. Johnson*, 89 F.3d 210, 212 (5th Cir.1996), *cert. denied*, 519 U.S. 1017, 117 S.Ct. 530, 136 L.Ed.2d 416 (1996); *Woods v. Johnson*, 75 F.3d 1017, 1035 n. 26 (5th Cir.1996), *cert. denied*, 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *Irving v. Hargett*, 59 F.3d 23, 26 (5th Cir.1995), *cert. denied*, 516 U.S. 1120, 116 S.Ct. 929, 133 L.Ed.2d 857 (1996); and *Johnson v. Hargett*, 978 F.2d 855, 859–60 (5th Cir.1992), *cert. denied*, 507 U.S. 1007, 113 S.Ct. 1652, 123 L.Ed.2d 272 (1993). Thus, the unexplained failure of petitioner's state habeas counsel to assert petitioner's "presumed prejudice" theory during petitioner's state habeas corpus proceeding cannot satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine. Petitioner alleges no other facts sufficient to establish either "cause" or "actual prejudice" for his failure to urge his "presumed prejudice" theory in support of his initial claim for relief in his state habeas corpus application.

c. *No Showing of "Actual Innocence"*

■■■■ In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir.2001) (holding that the fundamental miscarriage of justice exception is limited to cases where the petitioner can make a persuasive showing that he is ac-

tually innocent of the charges against him); *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir.2000) (holding that the fundamental miscarriage of justice exception is confined to cases of actual innocence where the petitioner shows, as a factual matter, that he did not commit the crime); *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir.1999) (holding that the fundamental miscarriage of justice exception is confined to cases of actual innocence where the petitioner shows that he did not commit the crime of conviction); *Muniz v. Johnson*, 132 F.3d 214, 221 n. 12 (5th Cir.1998), *cert. denied*, 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998). To satisfy the "factual innocence" standard, a petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *See Sawyer v. Whitley*, 505 U.S. at 335–40, 112 S.Ct. at 2517–19, (holding that to show "actual innocence" in the context of a capital sentencing scheme, one must show by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state statute and that "factual innocence" means a fair probability that, in light of all the evidence, the trier of the facts would have entertained a reasonable doubt as to the defendant's guilt); *Kuhlmann v. Wilson*, 477 U.S. 436, 455 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986), (holding the same); *Fairman v. Anderson*, 188 F.3d at 644 ("To establish the requisite probability that he was actually innocent, the petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'"). In other words, to satisfy the "factual innocence" standard, a petitioner must establish a fair probability

that, considering all of the evidence now available, the trier of fact would have entertained a reasonable doubt as to the defendant's guilt. *See Sawyer v. Whitley*, 505 U.S. at 336–41, 112 S.Ct. at 2517–19, (holding that to show "actual innocence" in the context of a capital sentencing scheme, one must show by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state statute and that "factual innocence" means a fair probability that, in light of all the evidence, the trier of the facts would have entertained a reasonable doubt as to the defendant's guilt); *Kuhlmann v. Wilson*, 477 U.S. 436, 455 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986) (holding the same); *Finley v. Johnson*, 243 F.3d at 220: "To establish the requisite probability that he was actually innocent the petitioner must support his allegations with new, reliable evidence that was not presented at trial and show that it was 'more likely than not that no reasonable juror would have convicted him in the light of this new evidence.'"; *Fairman v. Anderson*, 188 F.3d at 644, (discussing as examples of new, reliable, evidence that satisfy the actual innocence standard exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence). The "factual innocence" test, therefore, requires the Court to give consideration to the all of the evidence now available to the Court on the issue of the petitioner's guilt or innocence.

■ Even more simply, the defendant must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him. *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 1611, 140 L.Ed.2d 828 (1998); *Schlup v. Delo*, 513 U.S. at 327–28, 115 S.Ct. at 867–68; *United States v. Sorrells*, 145 F.3d 744, 749 (5th Cir.

1998); *Lucas v. Johnson*, 132 F.3d at 1077; *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir.1997), *cert. denied*, 520 U.S. 1267, 117 S.Ct. 2438, 138 L.Ed.2d 198 (1997), (holding that "actual innocence" means factual, as opposed to legal innocence, i.e., a showing that the person did not commit the crime); and *Johnson v. Hargett*, 978 F.2d 855, 859–60 (5th Cir.1992), *cert. denied*, 507 U.S. 1007, 113 S.Ct. 1652, 123 L.Ed.2d 272 (1993), (holding the same). As explained above, in the context of a capital sentencing proceeding, a defendant urging his "actual innocence" must show by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found him eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* that this "actual innocence" requirement focuses on those elements which render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523.

Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice exception to the procedural default doctrine.

### D. *No Relief on the Merits Under the AEDPA*

#### 1. *No Relief on Unexhausted Legal and Factual Theories*

As explained above, the AEDPA precludes this Court from granting federal habeas corpus relief based on petitioner's unexhausted legal and factual theories underlying his ineffective assistance claim herein. *Kunkle v. Dretke*, 352 F.3d at 988 ("28 U.S.C. § 2243(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."); *Riley v. Cockrell*, 339 F.3d at 318; *Anderson v. Johnson*, 338 F.3d at 386; *Henry v. Cockrell*, 327 F.3d at 432 ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief.").

#### 2. *No Merit to Exhausted Portion of Claim*

##### a. *State Court Determination*

However, petitioner "fairly presented" the state habeas court with a portion of the legal and factual arguments that underlay his first claim for federal habeas relief herein. More specifically, petitioner argued before the state habeas court that his state trial counsel rendered ineffective assistance by (1) failing to present mitigating evidence during the punishment phase of trial and (2) relying upon then-existing state and federal case law in deciding to comply with petitioner's directives not to present a defense at the punishment phase of trial. The state habeas court found that (1) petitioner instructed his trial counsel that he did not wish them to offer any evidence at the punishment phase of trial and (2) petitioner's trial counsel followed that instruction.[42] The state habeas court also concluded that petitioner's instructions effectively "pre-empted" his complaints about his trial counsel's punishment-phase performance.[43] Based on

---

**42.** State Habeas Transcript, Volume III, at p. 5

**43.** *Id.*, at p. 12.

those determinations, the state habeas trial court recommended that state habeas relief be denied. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied state habeas relief.

### b. State Court Rejection of Exhausted Claim Reasonable

#### (1) Standard of Review

Applying the AEDPA's standard of review, the issue before this Court is whether the Texas Court of Criminal Appeals could *reasonably* have concluded that petitioner's complaints about his trial counsel's performance failed to satisfy *either* prong of the *Strickland* analysis. *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir.2003), *cert. denied,* 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* Significantly, the Supreme Court's opinion in *Strickland* addressed the performance of trial counsel during the punishment phase of a capital murder trial, a role which the Supreme Court specifically held requires criminal defense counsel to ensure that the adversarial testing process works to produce a just result under the constitutional standards governing the capital sentencing decision. *Strickland v. Washington,* 466 U.S. at 686–87, 104 S.Ct. at 2064. In evaluating the performance of trial counsel during the punishment phase of a capital sentencing proceeding, the Supreme Court held in *Strickland* that the proper inquiry has two parts: first, whether counsel's errors were so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and second, whether counsel's errors were so serious

as to deprive the defendant of a fair trial, whose result is reliable. *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064.

#### (2) State Habeas Court Identified the Proper "Clearly Established" Federal Standard

The Supreme Court has repeatedly held that complaints such as those voiced by petitioner during his state habeas corpus proceeding are to be evaluated under the dual prongs of *Strickland.* In *Bell v. Cone,* the Supreme Court rejected an argument that a presumption of prejudice arose from a trial counsel's failure to present mitigating evidence and waiver of oral argument at the punishment phase of a capital trial, expressly holding that such complaints are subject to both prongs of *Strickland* analysis. *Bell v. Cone,* 535 U.S. at 697–98, 122 S.Ct. at 1851–52. In *Bell,* the Supreme Court expressly relied on its earlier opinion in *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), in which it held that complaints regarding the failure of a trial counsel to adequately investigate, develop, and present mitigating evidence at the punishment phase of a capital trial must be evaluated under the dual prongs of *Strickland. Darden,* 477 U.S. at 184, 106 S.Ct. at 2473. Finally, in *Strickland,* the Supreme Court applied the dual prongs in question to a complaint about trial counsel's failure to adequately investigate, develop, and present mitigating evidence at the punishment phase of a capital trial. *Strickland,* 466 U.S. at 698–701, 104 S.Ct. at 2070–71. Thus, the Texas Court of Criminal Appeals acted in a manner wholly consistent with "clearly established" federal law when it applied both prongs of *Strickland* to its analysis of petitioner's first claim for state habeas corpus relief, i.e., petitioner's complaint of ineffective assistance arising from his trial counsel's failure to present mitigating evidence.

### (3) *State Habeas Court Reasonably Concluded No Strickland Prejudice Established*

The petitioner's complaints about his trial counsel's performance which he "fairly presented" during his state habeas corpus proceeding focused almost entirely on the failure of his trial counsel to present mitigating evidence, as opposed to petitioner's unexhausted complaint about the failure of said counsel to ensure the punishment phase of petitioner's capital trial was a true adversarial proceeding. Petitioner also complained before his state habeas court that his trial counsel "unreasonably" relied on then-existing state and federal case law in determining to comply with petitioner's clear directives that no defense be mounted on his behalf and that no evidence be presented, no objections be made, and no cross-examination of prosecution witnesses be attempted during the punishment phase of his capital trial. The fundamental problem with both these complaints is that petitioner presented his state habeas court with no fact-specific allegations, much less any evidence, showing a reasonable probability that but for either of these alleged deficiencies in the performance of his trial counsel, the outcome of the punishment phase of his capital trial would have been different.

To determine whether trial counsel's treatment of mitigating evidence prejudiced the defendant, a reviewing court must evaluate the totality of the available mitigating evidence. *See Williams v. Taylor*, 529 U.S. at 397–98, 120 S.Ct. at 1515 (the prejudice inquiry concerning mitigating evidence requires evaluation of the totality of the available mitigation evidence—both that adduced at trial and evidence adduced in the habeas corpus proceeding—in re-weighing that mitigating evidence against the aggravating evidence).

The sum and substance of petitioner's discussion of "prejudice" in the initial claim in his state habeas application consisted of a naked assertion that the failure of his trial counsel to present unspecified mitigating evidence constituted ineffective assistance.[44] While petitioner made several cryptic references to purported mitigating evidence contained in the affidavits attached to his state habeas application, petitioner never specifically advised the state habeas court as to precisely what "mitigating evidence" was contained in those affidavits.

This Court's independent examination of the affidavits attached as exhibits to petitioner's state habeas corpus application revealed nothing in the way of compelling mitigating evidence. Exhibit 1, i.e., the affidavit of petitioner's former girlfriend and the mother of petitioner's child, offered only conclusory assertions that petitioner was not a violent person, once wept after killing a deer, could not hold a job, did not drink heavily or use drugs, did not like to carry a gun, and did not tell her about any history of child abuse in his family.[45] Exhibit 2, the affidavit of petitioner's co-counsel at trial, states simply that (1) petitioner requested that said counsel present no evidence at the punishment phase of trial, (2) petitioner expressed a preference for a death sentence, (3) while he felt petitioner's request irrational, he nonetheless felt an ethical obligation to comply with petitioner's directive, (4) but for petitioner's directive, he was prepared to present testimony from unidentified witnesses showing that petitioner had never been violent before, (5) Dr. Coons was prepared to testify that, in his opinion, petitioner would not be violent

---

**44.** State Habeas Transcript, Volume I, at pp. 25–26.

**45.** State Habeas Transcript, Volume I, at pp. 115–17 (affidavit of Nadia Jean Mireles Howell).

in the future, but (6) petitioner's directive foreclosed him from presenting Dr. Coons' testimony at trial.[46] Exhibit 3, the affidavit of petitioner's step-mother, states that (1) petitioner was diagnosed with learning problems and learning disorders, i.e., attention disorder and hyperactive disorder, while in elementary school, (2) petitioner read at only the third or fifth grade level when he graduated from high school, (3) petitioner has a limited attention span, and (4) petitioner was not accepted by his peers and was not a leader or planner.[47] Exhibit 4, the affidavit of petitioner's father, states that (1) petitioner had a "somewhat difficult" childhood, had a learning disorder, and was "seen as different by his peer group," (2) following his arrest, petitioner cooperated with law enforcement officials, (3) petitioner was unwilling to help his attorney present a good defense because petitioner did not believe himself to be "guilty," (4) petitioner had difficulty hurting other things, and (5) petitioner was non-violent.[48] Exhibits 5 & 6, the affidavits of records custodians for the Northside Independent School District, accompanied copies of petitioner's school records showing, in pertinent part, that (1) petitioner was assessed in 1990 as eligible to receive special education services for emotionally disturbed students because he suffered from "overanxious disorder" and (2) petitioner was evaluated in 1987 as functioning in the low average intellectual range, suffering from an emotional disor-

der (overanxiousness), and demonstrating impulsive and disorganized behavior.[49] Significantly, petitioner did not present his state habeas court with any affidavit from Dr. Coons or any further evidence directly addressing the question of petitioner's propensity for future violence or rebutting any of the prosecution's punishment-phase evidence regarding petitioner's violent behavior while in pretrial custody. In short, the purported "mitigating evidence" proffered to the state habeas court by petitioner was extremely meager.

As explained in Section I.E. above, the prosecution presented evidence at the punishment phase of petitioner's trial showing that (1) petitioner and Reneau had robbed another store slightly more than a month before their robbery of Keeran's store, (2) during their pretrial detention, petitioner and Reneau were observed by jail personnel plotting an escape, (3) on another occasion during his pretrial detention, petitioner reacted violently when jail officials refused his request to transfer funds to Reneau's account, (4) petitioner thereafter refused repeated directives to cease pushing the emergency call button in his cell, (5) when jail personnel attempted to move petitioner to another cell, he resisted violently, striking one guard, and (6) petitioner then wrote a letter to Reneau in which he bragged about the complaint he had filed against the guards whom he had assaulted.[50] In addition to this evi-

46. *Id.,* at pp. 119–21 (affidavit of Scott Monroe).

47. *Id.,* at pp. 123–24 (affidavit of Mitzie Wood).

48. *Id.,* at pp. 126–28 (affidavit of Daniel Clayton Wood, Jr.).

49. *Id.,* at pp. 130–82 (affidavits of Pamela A. Goebel and L. Kay Wright and attached business records). For unknown reasons the first volume of the State Habeas transcript from petitioner's state habeas corpus proceeding is missing pages 137–56. However, a complete set of exhibits 5 and 6 and all documents accompanying same appear as attachments to the separate copy of petitioner's state habeas corpus application contained among petitioner's state habeas corpus records. It should be noted, however, that the text of this separate state habeas application is not an identical copy of the state habeas application contained in State Habeas Transcript, Volume I.

50. *See* notes 20–23, *supra,* and accompanying text.

dence, the petitioner's jury also had before it the evidence presented during the guilt-innocence phase of petitioner's trial, which established, among other things, that (1) following his arrest, petitioner initially attempted to downplay his role in the offense,[51] (2) petitioner and Reneau returned to their residence at one point in the hours before the robbery in order to trade one handgun for another that Reneau felt would be quieter,[52] (3) petitioner and Reneau knew the afternoon before Keeran's murder that Keeran had decided not to cooperate with their plan to rob the store,[53] and (4) when petitioner's younger brother expressed skepticism over petitioner's account of Keeran's murder and robbery, petitioner (a) showed his brother the videotape recording of Reneau's fatal shooting of Keeran, (b) smiled and told his brother "I told you that he shot somebody," and (c) directed his brother to destroy the videotape.[54]

In view of the uncontradicted, overwhelming, evidence of petitioner's violent conduct during his pretrial detention, as well as the prosecution's other evidence, the state habeas court could have reasonably concluded that petitioner's first claim for state habeas relief failed to satisfy the prejudice prong of *Strickland.* More specifically, given the overwhelming evidence demonstrating petitioner's propensity for future violence (amply established by petitioner's own conduct while in pretrial custody), the fact that Keeran's murder occurred during the *second* robbery un-

dertaken by Reneau and petitioner, the fact that Reneau and petitioner were aware at the time they went to the store on the date of the murder that Keeran was not going to cooperate with their robbery plan, the fact that they traded weapons for the express purpose of obtaining a quieter gun, and petitioner's failure to express any sincere remorse over Keeran's death in his letter to Reneau, the Texas Court of Criminal Appeals could reasonably have concluded there was no reasonable probability that, but for the failure of petitioner's trial counsel to present the mitigating evidence proffered to the state habeas court via affidavit, the petitioner's jury would have answered any of the capital sentencing special issues at the punishment phase of petitioner's trial in a manner favorable to petitioner. *See Miniel v. Cockrell,* 339 F.3d 331, 347–48 (5th Cir.2003), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004), (where evidence of the defendant's propensity for violence overwhelmed the family's proposed mitigating testimony regarding defendant's history of childhood physical abuse and substance abuse, petitioner was not prejudiced by the failure of his trial counsel to present such mitigating evidence).

### (4) Deficient Performance Irrelevant

Respondent argues that the conduct of petitioner's trial counsel was objectively reasonable as a matter of law because said counsel was required to defer to petitioner's suicidal wishes.[55]

---

**51.** *Compare* petitioner's first custodial statement, S.F. Trial, Volume 24, at pp. 270–310, *with* petitioner's second custodial statement, S.F. Trial, Volume 25, at pp. 12–39.

**52.** S.F. Trial, Volume 25, at pp. 23–24 (petitioner's second statement).

**53.** S.F. Trial, Volume 25, testimony of Nadia Jean Mireles, at p. 86. This devastating testimony was presented at the guilt-innocence

phase of petitioner's trial not by the prosecution but by petitioner's own trial counsel. For unknown reasons, petitioner does not accuse his trial counsel of ineffective assistance in connection with eliciting this testimony.

**54.** S.F. Trial, Volume 24, testimony of Jonathan Ray Wood, at pp. 215–19, 223–24, & 226–27.

**55.** Respondent's Answer, at pp. 30–41.

The Supreme Court makes clear in *Strickland* that its application of the dual-pronged test for evaluating trial counsel's performance outlined in that opinion is premised upon trial counsel acting in a manner reasonably designed to ensure the defendant receives a fair trial, i.e., one in which there has been a true adversarial testing of the prosecution's case. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 (a reviewing court "should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case"). While the decision whether to present or not to present mitigating evidence often falls within the scope of an attorney's tactical or strategic decision-making authority, the decision by petitioner's trial counsel to waive cross-examination of all prosecution witnesses and to waive oral argument (for no other reason that to satisfy the suicidal whim of the defendant) most certainly do not. The Sixth Amendment includes not only a right to the effective assistance of counsel but also the right to confront adverse witnesses. The principal evil the Confrontation Clause was directed against was the civil law mode of criminal procedure, particularly the use of *ex parte* examinations as evidence against an accused. *Crawford v. Washington*, 541 U.S. 36, 50, 124 S.Ct. 1354, 1363, 158 L.Ed.2d 177 (2004). These constitutional guarantees are both designed to ensure effective adversarial testing of the prosecution's case against an accused. "Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* 466 U.S. at 688, 104 S.Ct. at 2065. Thus, application of the dual prongs of *Strickland* presupposes that a criminal defendant's trial counsel subjected the prosecution's case to a true adversarial testing, an essential element of which is the cross-examination of prosecution witnesses.

This Court is not unmindful of the long line of Fifth Circuit opinions holding that a trial counsel is not ethically required to ignore a client's objection to the presentation of certain types of mitigating evidence. *See, e.g., Nixon v. Epps*, 405 F.3d 318, 325–26 (5th Cir.2005) (holding the defendant cannot block his trial counsel from attempting one line of defense at trial and then argue on appeal that counsel was ineffective for failing to introduce evidence supporting that defense); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir.2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 1726, 161 L.Ed.2d 606 (2005), (where a defendant forbids his trial counsel from interviewing family members, the defendant may not thereafter complain of ineffective assistance arising from the failure to discover mitigating evidence known to those same family members); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir.2000), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001), (holding trial counsel may not be held ineffective for honoring his client's wishes that his family members not be interviewed or called to testify at trial as long as the client made an informed decision); *Amos v. Scott*, 61 F.3d 333, 348–49 (5th Cir.1995), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995), (holding no deficient performance or prejudice arose from trial counsel's failure to present a witness at the punishment phase of trial where the defendant strongly opposed having any witnesses testify on his behalf during the punishment phase and the defendant acknowledged same during a colloquy on the record in open court). However, none of these opinions demonstrate express Fifth Circuit approval for the rule urged by respondent herein, i.e., one compelling a criminal defense counsel to comply with a criminal defendant's insistence that his trial counsel completely and totally fail to subject the prosecution's case to adversari-

al testing, as occurred at the punishment phase of petitioner's trial.

Moreover, the Fifth Circuit recently suggested in an *en banc* opinion that there may be situations in which a criminal defense counsel is free to disregard his client's express and specific directives regarding trial strategy. *See Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir.2002), *cert. denied*, 537 U.S. 1072, 123 S.Ct. 676, 154 L.Ed.2d 567 (2002), (explaining that strategic decisions conceding portions of the prosecution's case to focus on others made by trial counsel in opposition to the defendant's express wishes remain tactical decisions insofar as they do not amount to a complete and total abandonment of the defendant or an entire failure to challenge the prosecution's case). Thus, the Fifth Circuit recognized in *Haynes*, as the Supreme Court held in *Bell v. Cone*, that a total abandonment of the defendant or an entire failure to challenge the prosecution's case warrants a presumption of prejudice and, at least inferentially, satisfies the deficient performance prong of *Strickland*.

Likewise, the Supreme Court has never squarely addressed the duty of a criminal defense counsel under *Strickland* to ensure that the defendant receives the benefit of a truly adversarial proceeding where the defendant insists on waiving not only his right to present a defense but also his right to make any challenge whatsoever to the prosecution's case during the punishment phase of a capital trial. Thus, the Supreme Court has yet to sanction the practice in this Circuit of permitting trial counsel to cooperate with a criminal defendant's attempt to commit suicide-by-jury. Where a trial counsel complies with a defendant's suicidal request to waive not only the defendant's right to present mitigating evidence but also the defendant's rights to cross-examine prosecution witnesses, object to inadmissible prosecution evidence, and make oral argument in favor of a life sentence at the punishment phase of a capital trial, there has been no "adversarial testing" of the prosecution's case within any intelligible meaning of that term.

Because petitioner did not present the state habeas court with any fact-specific allegations much less any evidence, establishing prejudice, it is not necessary for this Court to resolve the obvious conflict between the plain language of *Strickland* and the respondent's interpretation of Fifth Circuit precedent.

### E. Conclusions

Petitioner failed to exhaust available state remedies on substantial portions of the legal and factual theories underlying his first claim for federal habeas corpus relief herein and, thereby procedurally defaulted on same. The Texas Court of Criminal Appeals' rejection on the merits of the properly exhausted portion of petitioner's ineffective assistance claim presented to this Court was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### IV. Denial of Requests to Proceed Pro Se

### A. The Claim

In his second claim for federal habeas relief, petitioner argues that the state trial court erroneously denied his requests to dismiss his trial counsel and proceed *pro se* during the punishment phase of petitioner's capital trial.[56]

---

**56.** Petition, at pp. 58–76; Petitioner's Reply to Respondent's Answer, filed April 28, 2005, docket entry no. 25 (henceforth "Reply"), at pp. 2–31.

## B. State Court Disposition

As explained above in Section I.D. above, the trial court denied petitioner's requests to discharge his trial counsel and proceed *pro se* during the punishment phase of his capital trial. The state habeas court found that the trial court had acquired familiarity with petitioner's background and concluded that there was no error in denying petitioner's requests, in part, because petitioner's mid-trial request to represent himself was untimely.[57]

## C. Clearly Established Federal Law

The Supreme Court held in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), that the Sixth Amendment's right to the assistance of counsel implicitly embodies a correlative right to dispense with a lawyer's help and to voluntarily and intelligently waive the right to assistance of counsel. *Faretta*, 422 U.S. at 814, 95 S.Ct. at 2530–31. In so holding, the Supreme Court noted the right to self-representation it recognized therein found support in not only the language of the Sixth Amendment itself but also in the English and colonial jurisprudence from which the Amendment emerged. *Id.*, 422 U.S. at 818–32, 95 S.Ct. at 2532–40. The Court held that the right of a criminal defendant to defend himself is personal, as the defendant, and not his defense counsel, bears the personal consequences of a conviction; for that reason, the defendant must be free personally to decide how to conduct his own defense. *Id.*, 422 U.S. at 834, 95 S.Ct. at 2540–41. In *Faretta*, the defendant clearly and unequivocally declared his desire to represent himself weeks before trial and the record established the defendant was (1) literate and competent and (2) voluntarily exercised his free will to chose to represent himself. *Id.*, 422 U.S. at 835, 95 S.Ct. at 2541. Under such circumstances, the Supreme Court held the trial court deprived Faretta of his constitutional right to conduct his own defense when it forced him to accept against his will a state-appointed public defender. *Id.*, 422 U.S. at 836, 95 S.Ct. at 2541.

The same term it decided *Strickland*, the Supreme Court put further gloss on its holding in *Faretta* when it concluded in *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), that a criminal defendant's Sixth Amendment right to conduct his own defense was not violated by virtue of the trial court's insistence on appointing standby counsel to assist the defendant's self-representation, where the defendant vacillated, both before and during trial, with regard to whether he wanted to proceed *pro se* and how much assistance he wished to receive from standby counsel. *McKaskle v. Wiggins*, 465 U.S. 168, 176, 104 S.Ct. 944, 950, 79 L.Ed.2d 122 (1984) (holding that no absolute bar on standby counsel's unsolicited participation is appropriate or intended by the holding in *Faretta*). The defendant in *McKaskle v. Wiggins* initially filed a pretrial motion requesting to proceed *pro se*, subsequently filed a pretrial request for appointed counsel, and then, on the eve of trial, announced that he would be defending himself *pro se*, requested that court-appointed counsel not be allowed to interfere with his presentations to the court, and objected to the court's insistence that counsel remain available for consultation. *Id.*, 465 U.S. at 170–71, 104 S.Ct. at 947–48. Once trial began, the defendant (1) repeatedly interrupted his cross-examination of prosecution witnesses to consult with his standby counsel, (2) agreed to allow standby counsel to conduct portions of voir dire and to argue to the jury, (3) at times demanded the presence of standby counsel before the trial could

---

**57.** State Habeas Transcript, Volume III, at pp. 8 & 13.

continue, (4) at other times, did not object to proceeding in the absence of his standby counsel, (5) occasionally joined in objections standby counsel made to the actions of the prosecution, (6) at other times, expressly disavowed the objections made by standby counsel, and (7) following his conviction, moved for a new trial on the ground that standby counsel had unfairly interfered with presentation of his defense. *Id.,* 465 U.S. at 172–73, 104 S.Ct. at 948. The Supreme Court held that, unless the accused has acquiesced in representation through counsel, the defense presented is not the defense guaranteed by the Constitution because, in a very real sense, it is not the defendant's defense. *Id.* 465 U.S. at 173–74, 104 S.Ct. at 948. "The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *Id.,* 465 U.S. at 174, 104 S.Ct. at 949. Under the circumstances of that case, the Supreme Court held the defendant had been accorded all of those rights. *Id.*

The Supreme Court's Sixth Amendment analysis in *McKaskle v. Wiggins* continued further, as it held "[i]n determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id.,* 465 U.S. at 177, 104 S.Ct. at 950. "The specific rights to make his voice heard that Wiggins was plainly accorded form the core of a defendant's right of self-representation." *Id.* (citation omitted). While recognizing that the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel and that *Faretta* imposes some limits on the extent of standby counsel's unsolicited participation, the Supreme Court held that "the core of the *Faretta* right" is protected where the defendant maintains actual con-

trol over the case he chooses to present to the jury. *Id.,* 465 U.S. at 178, 104 S.Ct. at 951. The Supreme Court noted that (1) all conflicts between Wiggins and standby counsel were resolved in Wiggins' favor, (2) the trial court repeatedly explained to all concerned that Wiggins' strategic choices, not counsel's, would prevail, (3) on those rare occasions when disagreements arose between Wiggins and his standby counsel, the trial judge consistently ruled in Wiggins' favor, and (4) Wiggins frequently either solicited or acquiesced in certain types of participation by standby counsel to such an extent that it was difficult to determine how much of counsel's participation was, in fact, contrary to Wiggins' desires. *Id.,* 465 U.S. at 181–83 & 187, 104 S.Ct. at 952–53 & 955. While expressly disavowing any approval of the scope of standby counsel's role in Wiggins' trial, the Supreme Court concluded that Wiggins "unquestionably maintained actual control over the presentation of his own defense at all times" and concluded Wiggins' constitutional right to self-representation had not been violated in that case. *Id.,* 465 U.S. at 186–88, 104 S.Ct. at 955–56.

In *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the Supreme Court held that the competency required to plead guilty or to waive the right to counsel is the same as the competency standard for standing trial, i.e., whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. *Godinez v. Moran,* 509 U.S. at 396–400, 113 S.Ct. at 2685–87.

In *Martinez v. Court of Appeal of California, Fourth Appellate District,* 528 U.S. 152, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000), the Supreme Court questioned the efficacy

of the historical analysis underlying *Faretta* but ultimately distinguished its holding in that case when it concluded there is no constitutional right to self-representation on direct appeal. *See Martinez,* 528 U.S. at 160, 120 S.Ct. at 690 (holding that because the Sixth Amendment does not include any right to appeal, it necessarily follows that the Sixth Amendment itself does not provide a basis for finding a right to self-representation on appeal).

## D. *AEDPA Review*

The Supreme Court has expressly disavowed the use of harmless error analysis in reviewing an alleged violation of the self-representation right recognized in *Faretta. See McKaskle v. Wiggins,* 465 U.S. at 177 n. 8, 104 S.Ct. at 950 n. 8 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis."). Nonetheless, even a casual examination of the Supreme Court's opinion in *McKaskle v. Wiggins* reveals that the Supreme Court's inquiry in that case turned on whether the actions of standby counsel interfered with the defendant's "core *Faretta* right" to maintain actual control over the case he chose to present to the jury. *Id.,* 465 U.S. at 178, 104 S.Ct. at 951. Thus, the Supreme Court's inquiry in *McKaskle* was an eminently practical one, focused on whether the defendant was permitted "a fair chance to present his case in his own way." *Id.,* 465 U.S. at 177, 104 S.Ct. at 950. Toward that end, the Supreme Court analyzed the actions of Wiggins' standby counsel and noted that (1) with very few exceptions, standby counsel acted in a manner that at least objectively appeared to be consistent with Wiggins' avowed trial strategy and (2) the trial

court in that case resolved every conflict arising between Wiggins and his standby counsel in a manner favorable to Wiggins. *Id.,* 465 U.S. at 182–87, 104 S.Ct. at 953–55.

 It is readily apparent from a review of the trial court's exchanges with petitioner in connection with petitioner's requests to proceed *pro se* that the state trial court applied the wrong legal standard in rejecting petitioner's requests. The state trial court stated on the record that he was rejecting petitioner's requests because he did not believe petitioner was capable of representing himself. More specifically, the state trial judge stated on February 25, 1998 that he was denying petitioner's first oral request to proceed *pro se* because he did not believe petitioner was capable of understanding all the legal concepts involved in a capital sentencing proceeding without the assistance of legal counsel.[58] On March 2, 1998, when he denied petitioner's formal, written, motion for leave to proceed *pro se,* the state trial judge stated that he was doing so because, based on his knowledge of petitioner's educational background and experience with the criminal justice system, he believed petitioner still needed the assistance of counsel to fully understand what was going on and to ensure that petitioner was not taken advantage of during the punishment phase of trial.[59] However, the Supreme Court has expressly rejected this standard for determining whether a defendant can lawfully waive his right to counsel. *See Godinez v. Moran,* 509 U.S. at 398–400, 113 S.Ct. at 2686–87 ("the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself"). The state trial court's express reliance on petitioner's ina-

---

**58.** S.F. Trial, Volume 26, at p. 52.

**59.** S.F. Trial, Volume 30, at p. 10.

bility to adequately represent himself was an erroneous basis for rejecting petitioner's request to proceed *pro se.*

Even though harmless error analysis is inapplicable to review of a denial of the right recognized in *Faretta,* this Court's determination that the state trial judge's denials of petitioner's requests to proceed *pro se* were incorrect does not end this Court's inquiry under the AEDPA. As the Supreme Court has recognized, federal habeas relief is available under the AEDPA only when the state court's application of clearly established federal law was objectively unreasonable and an "unreasonable" application is different from a merely incorrect one. *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an *objectively unreasonable manner*"). While it is true that the state trial court denied petitioner's requests for leave to proceed *pro se,* the state trial court also advised petitioner that he was free to direct his trial counsel to conduct petitioner's defense at the punishment phase of trial in any manner petitioner saw fit.[60] Furthermore, the state trial court also advised petitioner's trial counsel that he wanted said counsel to remain present during the punishment phase of trial primarily for the purpose of advising petitioner regarding those proceedings, rather than to serve as advocates for petitioner.[61] In effect, the state trial court advised both petitioner and petitioner's trial counsel that, henceforth, petitioner's trial counsel would serve as little more than standby counsel for petitioner.

There is no question that, throughout the punishment phase of his capital trial, in every respect, petitioner maintained actual control over the case he chose to present to the jury. As explained in Section I.E. above,[62] petitioner initially requested leave to proceed *pro se* at the conclusion of the guilt-innocence phase of his trial because he feared his trial counsel would refuse to obey petitioner's directives with regard to how he wished his defense to be conducted at the punishment phase of trial.[63] At that point, the state trial court admonished petitioner in open court that "you control your defense" and explained that petitioner's trial attorneys would have to "follow your lead as to what you want to do."[64] During a pair of conferences held that same date, petitioner specifically directed his trial counsel not to (1) cross-examine any prosecution witnesses, including Dr. Grigson, (2) present Dr. Coons' expert testimony, (3) prepare or call any of petitioner's family or any other character witnesses to testify on petitioner's behalf, or (4) do anything that might result in petitioner receiving a life sentence.[65] Prior to the start of the punishment phase of petitioner's capital trial, petitioner again met with his trial counsel and reiterated his previous directives and acknowledged that he fully understood the likely consequence of his decision would be that he would receive a death sentence.[66] In a colloquy with the trial court in open court shortly thereafter, petitioner once again explained that he preferred to received a death sen-

---

**60.** S.F. Trial, Volume 26, at p. 52; S.F. Trial, Volume 30, at pp. 9–10.

**61.** S.F. Trial, Volume 26, at pp. 54–56.

**62.** *See* notes 18–23, *supra,* and accompanying text.

**63.** S.F. Trial, Volume 26, at p. 51.

**64.** *Id.*

**65.** *See* notes 19–20, *supra,* and accompanying text.

**66.** *See* note 22, *supra,* and accompanying text.

tence and, for that reason, wished to have his trial counsel discharged.[67] However, under questioning from the trial court petitioner acknowledged that his trial counsel was cooperating with petitioner's wishes in that regard.[68] Further, petitioner's trial counsel advised the court on the record that, despite their personal moral aversion to petitioner's strategic decision, they felt compelled by their own review of applicable case law to cooperate with petitioner's directives regarding the conduct of the defense at the punishment phase of trial.[69] During the punishment phase of petitioner's trial, his trial counsel presented no evidence and cross-examined no prosecution witnesses.

In another private conference held at the conclusion of the presentation of evidence at the punishment phase of trial, petitioner (1) acknowledged that his trial counsel had done exactly as petitioner had requested, (2) authorized his trial counsel to file an objection to the trial court's punishment-phase jury charge, but (3) directed his trial counsel not to make any argument on petitioner's behalf.[70] Thereafter, petitioner's trial counsel did precisely as petitioner directed. Throughout the entirety of the punishment phase of petitioner's trial, his trial counsel performed in strict conformity with petitioner's self-destructive directives. For all intents and purposes, petitioner's trial counsel acted as little more than standby counsel during the punishment phase of petitioner's trial.

Petitioner identifies nothing done by his trial counsel during the punishment phase of his trial which deviated from petitioner's express and specific directives. In every sense of the word, petitioner was the "master" of his own defense throughout the punishment phase of his capital trial. The record of petitioner's colloquies with the trial court and petitioner's conferences with his trial counsel make abundantly clear that petitioner was well aware of both the constitutional rights he was forsaking, as well as the likely outcome of the punishment phase of his capital trial, if he persisted in his suicidal directives to his trial counsel. Therefore, the core concerns of *Faretta* were not violated when the trial court refused to discharge petitioner's trial counsel mid-trial in the face of petitioner's admissions, as well as those of his trial counsel, that said counsel were fully willing to comply with petitioner's strategic directives, even though said counsel found those directives personally offensive. *See Jacobs v. Scott,* 31 F.3d 1319, 1329 (5th Cir.1994), *cert. denied,* 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995), (holding no constitutional error arose from trial counsel's compliance with a capital defendant's directives that no defense witnesses be called and no closing argument be made at the punishment phase of trial where the district court fully informed the defendant of the pitfalls of self-representation). Petitioner knew full well the likely result of his directives to his trial counsel at the punishment phase of trial, as is amply demonstrated by the record of petitioner's in-chambers conferences with said counsel. Petitioner received exactly what he demanded his trial counsel seek to achieve at the punishment phase of trial and advised his trial counsel in conference that he was satisfied with the performance of said counsel at the punishment phase of trial.[71]

Under such circumstances, the state habeas court could have reasonably conclud-

---

67. S.F. Trial, Volume 30, at p. 9.

68. *Id.,* at pp. 9–10.

69. *Id.,* at pp. 10–11.

70. S.F. Trial, Volume 31, at pp. 4–6.

71. S.F. Trial, Volume 31, at p. 4.

ed that, as was the case in *McKaskle v. Wiggins,* there was no violation of petitioner's constitutional right to "a fair chance to present his case in his own way." [72] While the state trial court may have erroneously denied petitioner's requests to proceed *pro se,* the state habeas court reasonably concluded that, nonetheless, the core concerns of *Faretta* were not violated during the punishment phase of petitioner's trial because, pursuant to the state trial court's directives and admonitions, petitioner's trial counsel served as little more than standby counsel for petitioner during the punishment phase of petitioner's capital trial. Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's second claim for federal habeas relief herein was neither (1) contrary to, nor involved an *unreasonable* application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## V. *Narrow Statutory Definition of "Mitigating Evidence"*

### A. *The Claim*

In his third claim for federal habeas relief, petitioner argues that the Texas capital sentencing statute's definition of "mitigating evidence" is unconstitutionally narrow because it focuses the jury's attention in connection with the final capital sentencing special issue on factors that reduce the defendant's "moral blameworthiness." [73]

### B. *State Court Disposition*

The state habeas court determined that (1) petitioner failed to allege any facts showing that he was harmed or otherwise prejudiced by the statutory definition in question and (2) Article 37.071, § 2(f)(4) of the Texas Code of Criminal Procedure is not unconstitutional because it does not limit the concept of "mitigation" to factors that render a capital defendant less morally blameworthy for the commission of a capital murder. [74]

### C. *Clearly Established Federal Law*

The Supreme Court established the constitutional standard for evaluating the propriety of a jury instruction at the punishment phase of a capital murder trial in its opinion in *Boyde v. California:* "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. *See Weeks v. Angelone,* 528 U.S. 225, 226, 120 S.Ct. 727, 729, 145 L.Ed.2d 727 (2000) (emphasizing the *Boyde* test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); *Jones v. United States,* 527 U.S. 373, 390 & n. 9, 119 S.Ct. 2090, 2102–03 & n. 9, 144 L.Ed.2d 370 (1999) (holding the same); *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 503, 142 L.Ed.2d 521 (1998) (holding the same); *Buchanan v. Ange-*

---

**72.** For this reason, it is unnecessary for this Court to address the validity of the Texas Court of Criminal Appeals' alternative holding that petitioner's mid-trial request to proceed *pro se* was untimely.

**73.** Petition, at pp. 76–81; Petitioner's Reply, at pp. 32–37.

**74.** State Habeas Transcript, Volume III, at pp. 10 & 14.

*lone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (holding the same); *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (holding *Boyde* requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence). The fact the jury instructions might have been erroneous as a matter of state law does not, standing alone, furnish a basis for federal habeas corpus relief. *Gilmore v. Taylor,* 508 U.S. 333, 342, 113 S.Ct. 2112, 2118, 124 L.Ed.2d 306 (1993); *Estelle v. McGuire,* 502 U.S. 62, 71, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Marshall v. Lonberger,* 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983).

### D. *AEDPA Analysis*

In conformity with Article 37.071 of the Texas Code of Criminal Procedure, the state trial court directed petitioner's jury to answer the following three capital sentencing special issues at the punishment phase of petitioner's trial:

#### Special Issue No. 1

Is there a probability that the defendant, JEFFERY LEE WOOD, would commit criminal acts of violence that would constitute a continuing threat to society?

#### Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that JEFFERY LEE WOOD, the defendant, himself, actually caused the death of Kriss Keeran, the deceased, on the occasion in question, or if he did not actually cause the deceased's death, that he intended to kill the deceased or another, or that he an-ticipated that a human life would be taken?

#### Special Issue No. 3

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? [75]

At the time of petitioner's trial, Section 2(f)(4) of Article 37.071, Texas Code of Criminal Procedure directed the trial court to instruct a capital sentencing jury in connection with the final capital sentencing special issue, i.e., the "mitigation" special issue, that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." In conformity with this statutory directive, petitioner's trial court instructed petitioner's jury as follows: "You are instructed that the term 'mitigating evidence' or mitigating circumstances means evidence that a juror might regard as reducing the defendant's moral blameworthiness." [76]

■■■ Petitioner's arguments in support of his third claim herein misconstrue the appropriate constitutional standard for evaluating the propriety of jury instructions at the punishment phase of a capital trial. As explained above, in *Boyde v. California,* the Supreme Court identified the proper inquiry in reviewing capital sentencing jury instructions as whether there is a reasonable likelihood the jury applied the challenged instructions in a way that prevented the consideration of constitutionally relevant evidence. *Boyde,*

---

**75.** Trial Transcript, Volume 2 of 2, at pp. 319–21.

**76.** Trial Transcript, Volume 2 of 2, at p. 320.

494 U.S. at 380, 110 S.Ct. at 1198. Thus, the federal constitutional issue properly before the state habeas court in connection with petitioner's challenge to the definition of "mitigating evidence" contained in Article 37.071, § 2(f)(4) was *not* whether the statutory language in question satisfied some abstract definition of the term "mitigating evidence" but, rather, whether the jury instructions actually given during petitioner's trial could reasonably be construed as precluding the jury from giving mitigating effect to any of the evidence properly before the jury at the punishment phase of petitioner's capital trial.

Petitioner does not identify any mitigating evidence he presented during his trial that he claims his jury was precluded from considering because of the allegedly narrow definition of "mitigating evidence" included in the Texas capital sentencing statute and incorporated in petitioner's punishment phase jury instructions. Having independently reviewed the entire record from petitioner's capital trial, this Court has been unable to identify any potentially mitigating evidence that a rational juror could have construed as outside its consideration at the punishment phase of petitioner's trial because of the definition of "mitigating evidence" included in petitioner's punishment-phase jury instructions. Thus, the petitioner's punishment phase jury instructions, including the definition of "mitigating evidence" included therein, did not violate the standard set forth in *Boyde*.

Insofar as petitioner's third claim for relief herein constitutes a facial attack on the constitutionality of the Texas capital sentencing statute's definition of "mitigating evidence," that claim lacks any argua-

ble merit. There is no clearly established federal law in the form of Supreme Court precedent mandating a definition of "mitigating evidence" broader than the one set forth in the Texas statute. The Texas statutory definition is fully consistent with the evolving notion of "mitigating evidence" contained in Supreme Court and Fifth Circuit precedent. *See Beazley v. Johnson*, 242 F.3d at 260 (holding that the same Texas statutory definition of "mitigating evidence" challenged by petitioner herein did not unconstitutionally preclude jury consideration of the mitigating aspects of any evidence of the defendant's character or background or the circumstances of the offense that the defendant presents at trial); *Cordova v. Johnson*, 993 F.Supp. 473, 489–98 (W.D.Tex.1998), *appeal denied*, 157 F.3d 380 (5th Cir.1998), *cert. denied*, 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999), (discussing the Supreme Court's analysis of mitigating evidence).[77] The Supreme Court's recent opinion in *Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), is not to the contrary. *See Tennard*, 542 U.S. at ——, 124 S.Ct. at 2571–72 (holding that evidence of significantly impaired intellectual functioning is inherently mitigating in nature because it might serve as a basis for a sentence of less than death, even in the absence of evidence showing a nexus between the defendant's impaired intellectual functioning and his offense).

Moreover, the Supreme Court has expressly held that States are not limited to submitting narrow special issues to the jury when the sentencing jury reaches the selection phase of a capital sentencing proceeding. Specifically, the Supreme Court held in *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750

---

**77.** Contrary to the request implicit in petitioner's pleadings herein, it is not within the province of this Court to "overrule" the Fifth

Circuit's clear holding adverse to petitioner in *Beazley*.

(1994), that, at the selection stage, the States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638. Finally, the Supreme Court has made it clear that the States are permitted to guide the discretion exercised by capital sentencing juries so long as the jury is not precluded from giving mitigating effect to evidence that does lessen the defendant's moral culpability or blameworthiness for his crime. *See Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (holding there is no constitutional requirement of unfettered sentencing discretion in the jury and that States are free to "structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty."); *Boyde v. California*, 494 U.S. at 377, 110 S.Ct. at 1196 (holding the same). The Texas statutory definition of "mitigating evidence" is a wholly proper method of guiding the discretion exercised by a capital sentencing jury.

Accordingly, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's third claim for federal habeas relief herein was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

**VI. Trial Court's Failure to Sua Sponte Make a Competency Determination and Ineffective Assistance for Failing to Request Mid–Trial Competency Determination**

A. *The Claims*

In his fourth claim herein, petitioner raises two separate, but related, complaints that (1) the trial court erred in failing to determine whether petitioner was competent to instruct his counsel not to mount any defense at the punishment phase of trial and, (2) his trial counsel rendered ineffective assistance in failing to request the trial court to make a determination whether petitioner was competent to so instruct said counsel.[78]

B. *Procedural Default on Unexhausted Claims*

Respondent correctly points out that petitioner presented neither of these two arguments to the Texas Court of Criminal Appeals as grounds for relief in either petitioner's direct appeal or state habeas corpus proceeding.[79]

 It is well-settled that a criminal defendant may not be tried unless he is competent. *Cooper v. Oklahoma*, 517 U.S. 348, 355, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996); *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993); *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975) ("a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). A criminal defendant is competent to stand trial if (1)

---

**78.** Petition, at pp. 82–86.

**79.** Respondent's Answer, at pp. 59–66.

he has sufficient ability at the time of trial to consult with his attorney with a reasonable degree of rational understanding and (2) he has a rational as well as factual understanding of the proceedings against him. *Godinez v. Moran,* 509 U.S. at 396, 113 S.Ct. at 2685; *Drope v. Missouri,* 420 U.S. at 172, 95 S.Ct. at 904; *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

The issue of competence may arise in two different contexts. First, a trial court is required to conduct an inquiry into the defendant's mental capacity *sua sponte* if the evidence raises a bona fide doubt as to competence; if the trial court received evidence, viewed objectively, which raises a reasonable doubt as to competence, yet fails to make further inquiry, the defendant is denied a fair trial; in such instances, a federal habeas court must consider whether a meaningful hearing can be held *nunc pro tunc* to determine retrospectively the defendant's competence at the time of trial; and, if so, the petitioner bears the burden of proving his incompetence by a preponderance of the evidence. *Pate v. Robinson,* 383 U.S. 375, 386–87, 86 S.Ct. 836, 842–43, 15 L.Ed.2d 815 (1966). This type of competence inquiry is frequently referred to as a *Pate* inquiry, after the Supreme Court's opinion in *Pate v. Robinson,* which established that procedure. Second, a habeas petitioner may simply assert that he was incompetent at the time of trial, thereby asserting a violation of the substantive right not to be tried while incompetent, rather than the procedural guarantee of a competency hearing outlined above. *Carter v. Johnson,* 131 F.3d

452, 459 n. 10 (5th Cir.1997), *cert. denied,* 523 U.S. 1099, 118 S.Ct. 1567, 140 L.Ed.2d 801 (1998). Having carefully reviewed petitioner's pleadings herein, this Court concludes petitioner's fourth claim herein does not assert a claim that the petitioner was actually incompetent to stand trial but, rather, is limited to a complaint that the state trial court should have held a competency hearing under *Pate.*[80]

■ Petitioner included no claims for relief in his state habeas corpus application complaining about the state trial court's failure to *sua sponte* hold a mid-trial hearing inquiring into petitioner's competency, as required by the Supreme Court's decision in *Pate.* Thus, petitioner failed to exhaust available state remedies on that complaint and, therefore, procedurally defaulted on same. *Coleman v. Thompson,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

■ Petitioner's state habeas corpus application did contain claims arguing that his trial counsel rendered ineffective assistance but none of those claims "fairly presented" the state habeas court with the specific complaint that petitioner should have requested a mid-trial competency determination when petitioner directed said counsel not to mount any defense at the punishment phase of trial. More specifically, petitioner's first two claims for state habeas corpus relief argued that petitioner's trial counsel rendered ineffective assistance by failing to present any mitigating evidence at the punishment phase of petitioner's trial and that petitioner's trial counsel's reliance on then-existing state and federal case law addressing an attorney's duty to comply with a client's directives was objectively unreasonable.[81]

---

**80.** Insofar as petitioner's pleadings in this Court can be construed as asserting that petitioner was actually incompetent to stand trial, petitioner procedurally defaulted on that claim by failing to "fairly present" same to the state court, either on direct appeal or in his state habeas corpus proceeding. This Court has carefully reviewed petitioner's state

trial court pleadings, petitioner's appellant's brief, and petitioner's state habeas corpus pleadings and finds nothing contained therein which "fairly presented" to the state courts a claim that the petitioner was actually incompetent to stand trial.

**81.** State Habeas Transcript, Volume I, at pp. 17–30.

In a footnote, petitioner argued that his trial counsel's reliance on petitioner's directives *not* to mount a defense at the punishment phase of trial was objectively unreasonable because (1) petitioner had been found incompetent to stand trial at petitioner's first competency hearing, (2) at petitioner's second competency hearing, his trial counsel had argued (albeit unsuccessfully) that petitioner was still incompetent to stand trial, and (3) the state trial court denied petitioner's requests to proceed *pro se*, in part, based on that court's implicit determination that petitioner was "not competent" to represent himself.[82] However, petitioner made no mention anywhere in his state habeas pleadings of any allegation that his trial counsel's failure to request a mid-trial competency determination constituted ineffective assistance. Under such circumstances, petitioner has procedurally defaulted on this unexhausted ineffective assistance claim. *Coleman v. Thompson,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

### D. *No Merits*

■ Alternatively, in the absence of any fact-specific allegations establishing that petitioner was, in fact, incompetent to stand trial at the time petitioner directed his trial counsel not to present any defense whatsoever during the punishment phase of petitioner's capital trial, both aspects of petitioner's procedurally defaulted fourth claim are without merit.

Petitioner's competence to stand trial was fully litigated during petitioner's two competency hearings. At the conclusion of the petitioner's second competency hearing, the jury found beyond a reasonable doubt that the petitioner then possessed sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and did possess a rational as well as factual understanding of the proceeding against him.[83] Petitioner alleges no specific facts showing that his mental or psychological condition changed between the time of that determination and the dates petitioner directed his trial counsel not to mount a defense at the punishment phase of his capital trial. Petitioner does not allege any specific facts showing that he suffered from suicidal ideation, severe depression, or any other debilitating mental illness at the time he directed his trial counsel not to mount any defense at the punishment phase of petitioner's capital trial.

The Supreme Court has held that it is not necessary for a trial court to maker a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel. *Godinez v. Moran,* 509 U.S. at 402 n. 13, 113 S.Ct. at 2688 n. 13 ("a competency determination is necessary only when a court has reason to doubt the defendant's competence"). Petitioner alleges no specific facts, other than his trial counsel's subjective opinion that petitioner's apparently suicidal directives to said counsel at the punishment phase of trial were "irrational," supporting a showing that petitioner was incompetent to stand trial at that juncture in petitioner's capital trial. Moreover, an objective reading of the petitioner's exchanges with both the trial court and with his trial counsel, outlined in Section I.E. above,[84] reveals that petitioner clearly possessed a rational, as well as factual, understanding of the case against him and was fully capable of communicating his suicidal wishes to his trial counsel with clarity and devastating effectiveness. It is painfully apparent

---

**82.** State Habeas Transcript, Volume I, at pp. 11–12 n. 3.

**83.** Trial Transcript, Volume 1 of 2, at p. 105.

**84.** *See* notes 18–23, *supra,* and accompanying text.

from even a cursory review of petitioner's exchanges with the trial court and his trial counsel that petitioner fully understood the consequences of his suicidal directives to his trial counsel. Petitioner explained to the trial court that he had given his trial counsel those directives because he did not wish to receive a life sentence.

In the case of Douglas Alan Roberts, this Court, per then-District Judge Edward C. Prado, held that a trial court is obligated to make the *sua sponte* inquiry required under *Pate* whenever a capital murder defendant announces in open court that he wishes to commit suicide-by-jury by directing his trial counsel not to mount any defense at the punishment phase of a capital trial. Despite finding constitutional error in Robert's trial, this Court determined that Roberts was not entitled to federal habeas relief under the AEDPA because, under the highly unusual circumstances of that case, Roberts had failed to establish that his trial court's failure to *sua sponte* conduct a *Pate* hearing was objectively unreasonable under clearly established federal law. On appeal from this Court, the Fifth Circuit rejected this Court's conclusion that a *Pate* error had occurred at Robert's trial, holding as follows:

> we decline to adopt a *per se* rule that, as a matter of law, a trial court must doubt a capital punishment defendant's competency, or conclude that such defendant does not understand the proceedings against him or appreciate their significance, or conclude that he cannot rationally aid his attorney in his defense simply because it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty.

*Roberts v. Dretke,* 381 F.3d 491, 498 (5th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1726, 161 L.Ed.2d 606 (2005).

In conducting a *de novo* review of petitioner's unexhausted fourth claim herein, this Court is bound by the Fifth Circuit's holding in *Roberts.* Albeit suicidal, petitioner's directives to his trial counsel at the punishment phase of his capital trial do not evidence behavior that the Fifth Circuit considers indicative of a lack of competency to stand trial.

While petitioner's suicidal directives to his trial counsel amounted to a *de facto* "guilty" plea and a waiver of the right to counsel at the punishment phase of his trial, under the Fifth Circuit's holding in *Roberts,* petitioner's trial court was under no obligation to *sua sponte* hold a competency hearing pursuant to *Pate.* The constitutional standard of competency to plead guilty and to waive the right to counsel is the same as the standard of competency to stand trial. *Godinez v. Moran,* 509 U.S. at 398–400, 113 S.Ct. at 2686–87 (holding the question of a criminal defendant's competence to waive the right to counsel is *not* the competence to represent himself and that a defendant's ability to represent himself has no bearing upon his competence to choose self-representation).

Insofar as petitioner complains that his trial counsel failed to request a competency determination when petitioner directed said counsel not to mount any defense at the punishment phase of trial, that complaint fails to satisfy either prong of the *Strickland* analysis. The jury determined petitioner's competency to stand trial beyond a reasonable doubt on October 9, 1997. Thereafter, petitioner made his counsel aware that, if convicted of capital murder, he preferred to receive a death sentence rather than a life sentence and that he wished his trial counsel to take no action that might lead to the imposition of a life sentence. The Fifth Circuit's opinion in *Roberts* expressly rejected this Court's reasoning in that same case that, in such

circumstances, a *Pate* hearing is necessitated because such a directive evidences a clear suicidal ideation on the defendant's part. In view of the Fifth Circuit's clear holding in *Roberts*, this Court is precluded from concluding that petitioner's trial counsel acted in an objectively unreasonable manner in failing to request a competency hearing at the punishment phase of petitioner's trial.

Furthermore, petitioner alleges no specific facts showing a reasonable probability that, had petitioner's trial counsel requested a competency hearing for petitioner at the conclusion of the guilt-innocence phase of petitioner's trial, the outcome of either phase of petitioner's trial would have been any different. While petitioner's relies on his trial counsel's subjective opinion regarding the obviously "irrational" nature of petitioner's punishment-phase directives to said counsel, petitioner offers no *evidence* showing that petitioner lacked either "sufficient ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him." On the contrary, the record from petitioner's colloquies with the trial court, as well as petitioner's in-chambers conferences with his trial counsel, reveal that petitioner understood what would happen if he directed his trial counsel to refrain from making any defense at the punishment phase of trial and was fully capable of explaining and communicating his desires to both his trial counsel and the state trial court. This Court reasoned in *Roberts* that a capital defendant's clear suicidal ideation, as evidenced by directives to his trial counsel to refrain from making any defense at the punishment phase of a capital trial, constituted a form of irrational behavior sufficient to warrant *sua sponte* inquiry under *Pate* into the defendant's competence to stand trial.

The Fifth Circuit expressly rejected that aspect of this Court's reasoning in *Roberts*. If, as the Fifth Circuit held in *Roberts*, petitioner's clear suicidal ideation was insufficient to warrant even an *inquiry* into petitioner's competence to stand trial, then evidence of such suicidal ideation by a capital defendant does not, standing alone, satisfy the prejudice prong of *Strickland*.

## VII. Objective Reasonableness Standard for Duress

### A. The Claim

In his fifth and final claim for federal habeas relief herein, petitioner argues that his federal constitutional right to equal protection of the laws was violated by the state trial court's refusal to give the jury an instruction at the guilt-innocence phase of trial which would have entitled petitioner to the affirmative defense of "duress." [85] More specifically, petitioner argues that Section 8.05 of the Texas Penal Code, was unconstitutional as applied to him because he is not a person of reasonable firmness.

### B. State Court Disposition

At all times relevant to petitioner's trial, Section 8.05(a) of the Texas Penal Code provided as follows: "It is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." Section 8.05(c) likewise provided as follows: "Compulsion within the meaning of this section exists only if the force or threat or force would render a person of reasonable firmness incapable of resisting the pressure." When petitioner challenged the constitutionality of these provisions to himself on direct appeal, the Texas Court of Criminal Appeals held that petitioner failed to carry the burden of establishing that no conceiv-

---

85. Petition, at pp. 86–89.

able basis existed to support the legislative classification. *Wood v. State,* 18 S.W.3d at 650–51.

## C. *Clearly Established Federal Law*

The Fourteenth Amendment's Equal Protection Clause commands that no State may deny to any person within its jurisdiction the equal protection of the laws. *Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997). While the Equal Protection Clause embodies no substantive rights, it sets forth a general rule that States must treat like cases alike but may treat unlike cases accordingly. *Id.* If a legislative classification or distinction neither burdens a fundamental right nor targets a suspect class, it will be upheld as long as it bears a rational relation to some legitimate end. *Id.*

In such instances, the burden is on the challenging party to negate the existence of any reasonably conceivable state of facts that could provide a rational basis for the classification. *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 367, 121 S.Ct. 955, 964, 148 L.Ed.2d 866 (2001). When conducting rational basis review, the court will not overturn governmental action unless the varying treatment of different groups is so unrelated to the achievement of any combination of legitimate purposes that the court is forced to conclude the government's actions were irrational. *Kimel v. Florida Board of Regents,* 528 U.S. 62, 84, 120 S.Ct. 631, 646, 145 L.Ed.2d 522 (2000).

## D. *AEDPA Analysis*

 Petitioner has alleged no specific facts showing that the requirement of objective reasonableness contained within the Texas statutory definition of the affirmative defense of "duress" impinges upon either the exercise of a fundamental right or a suspect classification. Petitioner relies on the same Supreme Court opinions to support his equal protection claim here-

in that the Texas Court of Criminal Appeals relied upon when that court rejected petitioner's equal protection claim on direct appeal. Thus, the Texas Court of Criminal Appeals correctly concluded the rational basis test was the appropriate standard of review for petitioner's equal protection challenge to the statutory definition of "duress" on direct appeal. The Supreme Court has never held that equal protection principles require a State to make an affirmative defense available to criminal defendants who conduct themselves in an objectively unreasonable manner.

Section 8.05 of the Texas Penal Code limits the availability of the affirmative defense of "duress" to those criminal defendants who engage in criminal conduct because they were "compelled" to do so by threat of death or serious bodily injury to themselves or another *provided* that any such threat was sufficient to render a person of reasonable firmness incapable of resisting same. Petitioner argues that it is irrational for the State of Texas to require a criminal defendant faced with an imminent threat of death or serious bodily injury to himself or another to display "reasonable firmness" to resist that threat before submitting to same. Yet petitioner identifies no authority providing that a criminal defendant possesses a constitutional right to assert an affirmative defense, such as duress, despite the fact the defendant's criminal conduct was an objectively unreasonable response to the circumstances in which the defendant found himself.

The State has a legitimate interest in promoting conduct which can be classified as *objectively* reasonable responses to criminal coercion. To permit a criminal defendant to avoid responsibility for his criminal conduct based solely upon that defendant's subjective emotional stability,

without regard to the objective reasonableness of such conduct vis-a-vis the coercion brought to bear on the defendant, would encourage criminal conduct that is an unreasonable response to the circumstances in which the defendant found himself. Section 8.05's definition of compulsion focuses the jury's attention on questions of "objective reasonableness under the circumstances" that are familiar to ordinary lay persons. In contrast, the subjective reasonableness standard urged by petitioner necessarily requires a highly individualized inquiry into the defendant's mental and emotional integrity and would actually encourage a person faced with criminal coercion to submit to same regardless of that defendant's ability to resist the pressure brought to bear upon him. Tangentially, a wholly subjective standard for the affirmative defense of duress might actually encourage criminal perpetrators to apply coercion against others to commit or assist in the commission of criminal conduct. The Texas Legislature's choice to limit the availability of the affirmative defense of duress to only those criminal defendants who behave in an objectively *reasonable* manner in response to criminal coercion cannot be classified as "irrational."

Under such circumstances, the Texas Court of Criminal Appeals' rejection on the merits of petitioner's equal protection claim was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's direct appeal.

E. *Teague Foreclosure*

▮▮▮▮▮ Furthermore, adoption of the new equal protection principle urged by petitioner in his fifth and final claim herein is precluded under the Supreme Court's

holding in *Teague v. Lane,* 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). Under the holding in *Teague,* federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen,* 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997), (holding that a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final") Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *See Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953.

▮▮▮▮▮ The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct

and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland,* 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen,* 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes on August 23, 2000, i.e., 91 days after the date the Texas Court of Criminal Appeals issued its opinion affirming petitioner's conviction on direct appeal and the date petitioner's deadline for filing a petition for writ of certiorari with the United States Supreme Court expired. *Beard v. Banks,* 542 U.S. 406, ——, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004) (recognizing that a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); 21 U.S.C. § 2101(d) (the deadline for filing a certiorari petition from a state criminal conviction shall be established by Supreme Court rule); Sup. Ct. Rule 13.1. *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks,* 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell,* 325 F.3d 243, 255 (5th Cir.2003), *cert. denied,* 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003) (recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA).

■ In his final claim for relief herein, petitioner argues that equal protection principles prohibit a State from conditioning the availability of an affirmative defense to criminal liability upon a criminal defendant's conduct meeting an *objective* standard of reasonableness under the circumstances. No authority exists for such a new rule. *Teague* forecloses adoption of such a new rule in this federal habeas corpus proceeding.

### VIII. *Request for Evidentiary Hearing*

■ Petitioner requests that this Court permit petitioner an evidentiary hearing. However, the AEDPA limits the circumstances in which a habeas corpus petitioner may obtain an evidentiary hearing in federal court, imposing a significant burden on petitioners who fail to diligently develop the factual bases for their claims in state court. *See Williams v. Taylor,* 529 U.S. 420, 433–34, 120 S.Ct. 1479, 1489, 146 L.Ed.2d 435 (2000), (prisoners who are at fault for the deficiency in the state court record must satisfy a heightened standard to obtain an evidentiary hearing); 28 U.S.C. § 2254(e)(2). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor,* 529 U.S. at 437, 120 S.Ct. at 1491. Under the AEDPA, if a petitioner failed to develop the factual basis of a claim in state court, he is entitled to a federal evidentiary hearing only if (1) the claim relies on either (a) a new rule of constitutional law, made retroactive on collateral review by the Supreme Court, that was previously unavailable or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence *and* (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have

found the petitioner guilty of the underlying offense. *Foster v. Johnson*, 293 F.3d 766, 775 n. 9 (5th Cir.2002), *cert. denied*, 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Dowthitt v. Johnson*, 230 F.3d at 757; 28 U.S.C. § 2254(e)(2).

 Petitioner was afforded a full and fair opportunity to develop and litigate his claims for relief herein during his state habeas corpus proceeding. Petitioner has presented this Court with no new evidence supporting any of his claims herein that was unavailable to him, despite the exercise of due diligence, during his state habeas corpus proceeding. Petitioner does not identify any new legal theories supporting his claims for relief herein that were unavailable at the time petitioner filed and litigated his state habeas corpus claims. Petitioner does not offer any rational explanation for his failure to fully develop any and all evidence supporting his claims herein during his state habeas evidentiary hearing. Nor does petitioner identify any additional evidence which he and his state habeas counsel were unable to develop and present to petitioner's state habeas court despite the exercise of due diligence on their part. Under such circumstances, petitioner is not entitled to a federal evidentiary hearing to further develop the facts supporting his claims herein.

## IX. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of Appealability ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir.1997), (recognizing that the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir.1997), (holding that the standard for obtaining a CoA is the same as for a CPC).

The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied*, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Coickrell*, 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n. 10 (5th Cir.2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n. 2 (5th Cir.2000), (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir.1997), (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n. 10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

 A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, ——, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004);

*Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); and *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need *not* show that he will prevail on the merits but, rather, demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at ——, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; and *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord, Tennard v. Dretke,* 542 U.S. at ——, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaus-

tion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604, (holding that when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

█ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Cardenas v. Dretke,* 405 F.3d 244, 248 (5th Cir. 2005), *cert. pending; Miller v. Dretke,* 404 F.3d 908, 913 (5th Cir.2005); *Martinez v. Dretke,* 404 F.3d 878, 884 (5th Cir.2005), *cert. pending; Bigby v. Dretke,* 402 F.3d 551, 557 (5th Cir.2005), *cert. pending; Matchett v. Dretke,* 380 F.3d at 848.

Viewed in proper context, there is no basis for disagreement among jurists of reason with regard to this Court's disposition of petitioner's third and fifth claims herein. The state court's rejections on the merits of petitioner's third and fifth claims herein were eminently reasonable under clearly established federal law. Furthermore, petitioner's final claim herein is also foreclosed by the non-retroactivity doctrine of *Teague.*

█ There can be no dispute among reasonable jurists that petitioner failed to exhaust available state remedies, and thereby procedurally defaulted, on that portion of his fourth claim herein in which petitioner complain about the trial court's failure to hold a competency hearing *sua sponte* during the punishment phase of petitioner's capital trial. However, the

procedural default on petitioner's alternative complaint that his trial counsel rendered ineffective assistance by failing to request such a determination once petitioner demonstrated a clear suicidal ideation is far from clear. Petitioner's state habeas pleadings arguably raised this complaint, albeit in a highly oblique fashion. Thus, this Court's determination that petitioner procedurally defaulted on the second portion of his fourth claim herein is subject to debate among reasonable jurists and deserves encouragement to proceed forward.

This Court's rejection of petitioner's first and second claims herein present substantial issues that could easily be resolved in a different manner by reasonable jurists. Petitioner's procedural default on his first claim herein is far less clear than is the case with petitioner's fourth claim herein. Reasonable jurists could debate whether procedural default bars consideration of the merits of petitioner's initial claim herein. The same holds true for this Court's alternative resolution of the underlying merits of petitioner's initial ineffective assistance claim herein. Petitioner's second claim herein likewise raises difficult issues that are fully capable of a different resolution by reasonable jurists.

■ Simply put, petitioner's trial counsel was well aware that petitioner was expressing suicidal ideation yet said counsel made no request for a competency determination and followed petitioner's suicidal directives during the punishment phase of trial, acting as little more than standby counsel, despite the fact the state trial court had denied petitioner's requests to proceed *pro se*. The result was a punishment phase of trial that lacked even the most rudimentary aspects of a truly adversarial proceeding. While this Court has concluded that petitioner's trial counsel's allegedly deficient performance did not prejudice petitioner within the meaning of *Strickland*, those conclusions are subject to debate among reasonable jurists and worthy of encouragement to proceed further. The same is true for this Court's conclusion that the state trial court's denial of petitioner's requests to proceed *pro se* did not deprive petitioner of his federal constitutional rights. Unfortunately, there can be no dispute among reasonable jurists that petitioner procedurally defaulted on the unexhausted *Pate* claim contained within his fourth claim for relief herein; said claim raises issues that deserve further review by a higher court but cannot be made the subject of a CoA in this case under the standard set forth in *Slack v. McDaniel.*

Therefore, petitioner is entitled to a Certificate of Appealability with regard to (1) both the procedural and substantive aspects of this Court's disposition of his initial claim herein, (2) this Court's disposition of petitioner's second claim herein, and (3) both the procedural and substantive aspects of this Court's disposition of that portion of petitioner's fourth claim herein in which petitioner complains of ineffective assistance by his trial counsel.

Accordingly, it is hereby **ORDERED** that:

1. All federal habeas corpus relief requested in petitioner's pleadings herein [86] is **DENIED**.

2. Petitioner's request for an evidentiary hearing is, in all respects, **DENIED**.

3. Petitioner is **GRANTED** a Certificate of Appealability with regard to (1) both the procedural and substantive aspects of his initial claim herein, (2) his second claim herein, and (3) both the procedural and substantive aspects of that portion of petitioner's fourth claim herein

---

**86.** Docket entry nos. 11 & 25.

in which petitioner complains of ineffective assistance by his trial counsel; in all other respects, petitioner is **DENIED** a certificate of Appealability.

4. Petitioner's motion for more definite statement[87] is **DISMISSED AS MOOT** in light of the filing of respondent's response thereto.

5. All other pending motions are **DISMISSED AS MOOT.**

6. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.